OIL CAPITAL RACING ASSOCIATION, INC., and Oklahoma Corporation, James E. Warren, Gerald D. Rea, Bob McCutchen, Ray Cates and Bill Bookout, and For All Persons Similarly Situated, Appellants,

v.

TULSA SPEEDWAY, INC., an Oklahoma Corporation, Appellee.

No. 54499.

Court of Appeals of Oklahoma, Division No. 2.

April 7, 1981.

Released for Publication by Order of Court of Appeals May 7, 1981.

David Nelson, Broken Arrow, for appellants.

Mark H. Finnerty, Tulsa, for appellee.

BRIGHTMIRE, Judge.

The question is whether the facts pleaded by plaintiffs, Oil Capital Racing Association, Inc., and certain of its members, permit the legal conclusion that they have an enforceable third party beneficial interest in a written contract between defendant Hugh Finnerty Enterprises, Inc.,[1] and Tulsa County Fairgrounds Trust Authority. We hold that those plaintiffs who are stock car drivers[2] do and reverse the dismissal order.

## I

According to plaintiffs' petition this controversy arose when Speedway, the race track promoter, refused to pay plaintiffs a percentage of certain race track receipts and otherwise perform as it was required to do under its agreement with the trust. Speedway, in due course, attacked the substance of the petition with a general demurrer. It was grounded on the theory that the pleading did not state a cause of action

against defendant because of a failure to allege or recite facts disclosing that Speedway and the trust made any agreement "expressly" for the benefit of plaintiffs as required by law.[3] The trial court sustained the demurrer and dismissed the plaintiffs' petition.

Disposition, then, centers on the narrow issue of whether or not the written concession contract between Speedway and the trust contains an agreement made expressly for the benefit of plaintiffs. Resolution of the question requires an examination of subject contract, a copy of which is attached to plaintiffs' petition.

Entitled a "Contract For Auto Races," the document recites that Speedway wants to conduct motor vehicle racing on a race track located on the fairgrounds in Tulsa, Oklahoma. It then states in material part that "in consideration of . . . $1.00 and other good and valuable consideration," the parties agree:

(1) Trust will grant Speedway a license to use the raceway facility;

(2) Speedway will pay rental to the trust in the amount of $3,000 per year plus percentages "of gross admission charges to each of [the] races, after federal and state amusement and sales tax have been deducted" ranging from 18 to 30 percent. "Gross admissions," continues the agreement, "shall include all types of Grandstand admissions sold at the main entrance gate, the race track pit entrance gate, all other entrance gates and all other places where tickets may be sold." If season percentages exceed the $3,000 minimum rental, then the $3,000 cash deposit shall be refunded. "In no event shall the fifty cent (50¢) pit pass exceed two for each car and in no case shall the Three Dollars ($3.00) pit fee per person exceed four for each race car";

1. Formerly Tulsa Speedway, Inc. However, a few months after this action was commenced the court signed an order substituting Tulsa Speedway, Inc., for Hugh Finnerty Enterprises, Inc., after reciting that the former was the successor of the latter. The title of the cause was changed notwithstanding the prohibition of 12 O.S.1971 § 295.

2. Since the contract refers to race drivers we doubt that the Association and nondriver owners of race cars, if any, are proper parties plaintiff.

3. 15 O.S.1971 § 29 reads:
"A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

(3) In numbered paragraph 18 of the contract it is stated: "Since an orderly and profitable racing season is beneficial to both parties to this agreement, and *TCFTA* [trust] *is therefore interested in the amounts paid drivers of vehicles* at such events, *SPEEDWAY agrees to pay to drivers of Stock Cars at such racing events a minimum of forty (40%) per cent of gross admission less tax* as has been the policy ...";[4]

(4) Speedway "shall pay all expenses," including those for "publicity, advertising, ... [and] keeping the track in shape ...";

(5) Part of the consideration for the contract is "the personal knowledge, experience and reputation of Hugh Finnerty, the principal stockholder and chief executive officer of SPEEDWAY ..... It is agreed that a sale of his interest, full or partial, in SPEEDWAY or a change in the management of SPEEDWAY which affects the actual status of Hugh Finnerty as chief executive and managing officer of such corporation shall be sufficient grounds for cancellation of this agreement ...";

(6) Numbered paragraph 28 reads: "No legally enforceable right shall inure to any person or persons not a party to this agreement."

The term of the agreement, signed January 13, 1975, was to end November 1, 1976, unless extended annually. This lawsuit, filed March 9, 1979, is in the nature of a class action brought on behalf of racing drivers to obtain a judicial interpretation of certain contract provisions which plaintiffs say have been breached by Speedway, namely:

(a) It has declined to include "receipts from the race track pit entrance gate" contrary to the agreed definition of "Gross Admissions," thus damaging race drivers to the extent of $62,400;

(b) It has, without approval of the trust, charged a pit fee in excess of $3 and this has damaged race drivers in the amount of $27,500;

(c) It has deducted certain promotion expenses from "Gross Admissions" before figuring the race drivers' 40 percent and this has damaged the drivers in the sum of $3,200;

(d) It has, without the approval of the trust, "installed a different person as promoter which materially affects" the racing drivers;

(e) It has failed to properly "maintain the tracks and install certain lighting on the ¼ mile track," a breach that entitles plaintiffs to specific performance.

The trial judge in his order sustaining the demurrer did not give a reason or an explanation for his decision, but we can assume he was impressed by Speedway's contention that subject contract was not made expressly for the benefit of the plaintiffs. Speedway's other argument was that plaintiffs pleaded only legal conclusions which could not be considered as having stated a cause of action—a tenuous legal conclusion that likely impressed the trial court as little as it does us.

## II

The crucial question is, does the pleaded contract contain an agreement that, by its terms, appears to have been made expressly for the benefit of "drivers of stock cars at racing events"? To us it does with reference to complaints (a), (b), (c), and (e). In fact, we have trouble figuring out how the parties could have made it any more expressly for the race drivers' benefit than to have phrased it the way they did. It is true that a mere incidental benefit accruing to the drivers would not be enforceable by them, but the benefit is not implicit, it is explicit: "SPEEDWAY agrees to pay to drivers of Stock Cars at such racing events a minimum of forty (40%) per cent of gross admission...," etc. Supporting the conclusion that the benefit is express is the recited reason given for making the agreement, namely, that the trust is "interested in the amounts paid drivers of vehicles at such events." The only incidental benefit in-

4. (emphasis added)

volved is that accruing to the contracting parties, viz: to foster "an orderly and profitable racing season."

Of course, when one gets right down to it the underlying problem is one of semantics—when is a promise expressly for a third party's benefit and when is the benefit merely incidental? The term "expressly" in a context relevant to this case means "directly" as distinguished from impliedly or indirectly. Thus the phrase "a contract, made expressly for the benefit of a third person" refers to a promise made directly for the third party's benefit. The benefit cannot be enforced if it has to be implied from the terms of the contract or results incidentally from its performance. The statute does not require the contract to expressly state that the beneficiary can enforce it, but only that the beneficial promise be express as it is here.

Moreover, it is not necessary that the third party beneficiaries be specifically named in the contract or be identifiable at the time the pact is made if it appears it was expressly made for the benefit of a class of persons to which group the party seeking enforcement belongs.[5]

Nor does paragraph 28 foreclose plaintiffs' right to sue. It does, however, tend to conflict with the statutory rights granted plaintiffs and, therefore, requires us to examine the contract in an effort to determine why the parties included the clause. Two things that stand out are the provisions of paragraphs 22 and 24. The first one discusses the potential of the contemplated races being prohibited by "a Governmental Agency or Court of law." The other addresses the potential of sound levels reaching a public nuisance level. Says the contract: "The parties hereto recognize that the sound emanating from the motor racing vehicles during racing periods may be irritating to certain residents in close proximity to the Fairgrounds. Therefore, SPEEDWAY agrees to take all action necessary to keep the sound levels ... at an acceptable level as hereinafter provided." Then follows a list of some six or more specific rules and requirements with which Speedway is bound to comply or enforce in order to achieve an acceptable sound level. It might well be found that paragraph 28 was intended to ward off the possibility of such rules and requirements becoming the foundation for an enforcement action by people residing in the neighborhood.

Speedway also contends that "plaintiffs have no standing to assert any right to interpretation of the contract" in question.[6] It is unnecessary to discuss further the various interpretational issues raised by Speedway because the case reaches us on the sustention of a demurrer to plaintiffs' petition and, as we said earlier, we hold the petition does state a cause of action. The cause is, therefore, remanded with directions to overrule defendant's demurrer and proceed with the disposition of the case according to law.

BACON, P. J., and BOYDSTON, J., concur.

---

5. *Barbero v. Equitable Gen. Ins. Co.*, Okl., 607 P.2d 670 (1980).

6. Speedway contends, for example, that plaintiffs' interpretation of ' admissions" is too broad and apparently concludes that the parties did not intend it to include pit fees. However, resolution of this issue should present no problem because "gross admissions" as defined in paragraph 2 does include pit fees.