**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**October 17, 2012**

**FOR THE TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

COLONY INSURANCE COMPANY, a
Virginia corporation,

        Plaintiff - Appellee,

v.

No. 10-5035

ROBBIE BURKE, Special Administrator
of the Estate of Aurora Espinal-Cruz,

        Defendant - Appellant,

and

DEANZA JONES, an Oklahoma resident,

        Defendant.

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:07-CV-00136-GKF-FHM)**
_____

Michael L. Barkett, The Barkett Law Firm, Tulsa, Oklahoma, for Defendant-Appellant.

John H. Tucker (Kerry R. Lewis and Randall E. Long, with him on the brief), Rhodes,
Hieronymus, Jones, Tucker & Gable, Tulsa, Oklahoma, for Plaintiff-Appellee.
_____

Before **HARTZ**, **EBEL**, and **HOLMES**, Circuit Judges.
_____

**EBEL**, Circuit Judge.

In this appeal we address (1) whether a foster child in Oklahoma has a "contractual or statutory" relationship with the insurance company that provides foster care liability insurance to the foster child's foster parent, such that the insurer owes the foster child either contractual obligations or an implied duty of good faith and fair dealing; (2) whether a judgment creditor may garnish a judgment debtor's insurance policy in excess of the insurer's actual liability to the judgment debtor; and (3) whether a defendant's status as intervenor in a co-defendant's cross-claim against a plaintiff is relevant to matters adjudicated solely between the defendant and the plaintiff. We have jurisdiction under 28 U.S.C. § 1291. We conclude that the answer to all three questions is no. Accordingly, we AFFIRM the judgment of the district court. Because we find the first question insufficiently novel, we also DENY Appellant's motion to certify the question to the Oklahoma Supreme Court. Finally, we DENY the parties' motions to file certain portions of their briefs and appendices under seal.

## I. BACKGROUND

### A. Aurora Espinal-Cruz's death and the underlying lawsuit

This case arises from a particularly sad and gruesome death. In January 2002, the Oklahoma Department of Human Services ("DHS") placed then-six-month-old Aurora Espinal-Cruz ("Aurora") and her four-year-old sister Cassandra into the foster care of Deanza Jones. Less than one month later, Aurora was found dead in her crib, killed by an untreated respiratory illness. Aurora had suffered greatly in the days before her death, having been left to lie in her own waste and vomit, while her skin was eaten by

2

cockroaches. Appellant, Aurora's estate (the "Estate"), brought a state-court wrongful-death action against Jones, the DHS, and two DHS employees in October 2003.

Oklahoma purchases liability insurance for foster parents who are licensed and/or certified by the DHS. As pertinent to this appeal, two companies provided that insurance: United National Insurance Company ("United"), which defended Jones in the wrongful death action, and Appellee Colony Insurance Company ("Colony"). Colony's and United's policies each had a $300,000 policy limit.

Prior to trial in the wrongful-death action, in July 2006, the Estate filed a claim with Colony, which Colony denied by letter on September 11, 2006, citing a limitation in the policy for injuries arising out of physical or sexual abuse, as well as another provision relieving Colony of a duty to defend where another carrier is defending. However, before trial, Colony and United made several offers of settlement, culminating in a combined offer to settle for $300,000, four days before trial. The Estate rejected the offer, but counter-offered for $600,000, the combined limits on both the United and Colony policies. Jones demanded that Colony accept the Estate's offer. Colony did not accept, however, and the case proceeded to trial.

In January 2007, after a three-day trial, the jury returned a verdict of $20 million in actual damages against Jones and in favor of the Estate. Because DHS had previously settled with the Estate for $175,000, the award was reduced by this amount, but prejudgment interest was added for a total judgment of over $24 million plus post-judgment interest. Jones appealed the judgment.

**B.      Colony's Declaratory Judgment Action and the Estate's Counterclaims**

3

On March 5, 2007, Colony filed a declaratory judgment action against the Estate and Jones in federal court, seeking a declaration that it had no duty to defend or indemnify Jones for the Estate's judgment against her. The Estate and Jones both answered and filed counterclaims against Colony based on Colony's denial of coverage and refusal to settle the Estate's claims against Jones. Specifically, the Estate asserted counterclaims for (1) breach of contract; (2) breach of the duty of good faith and fair dealing ("bad faith"); (3) garnishment; and (4) reformation of contract, while Jones asserted counterclaims for breach of contract and bad faith. The Estate also filed a third-party complaint against United, asserting similar claims, and filed a motion to intervene in Jones's counterclaims against Colony.[1] The district court eventually granted the Estate's motion to intervene in Jones' counterclaims against Colony, without comment.

On May 10, 2007, United filed a motion to dismiss the Estate's third-party claims for breach of contract and bad faith, arguing that the Estate lacked standing on these claims because neither it nor Aurora were an "insured" or a third-party beneficiary under the United policy. However, before the district court ruled on United's motion to dismiss, the Estate settled with United and with Jones. Under the Estate-United settlement, United paid the Estate $2.75 million and the Estate dismissed its third-party claims against United. Separately, Jones agreed to pursue her pending counterclaims for breach of contract and bad faith against Colony, and to dismiss her state-court appeal of the underlying wrongful-death judgment, in exchange for which the Estate promised to

---

[1] Jones did not file any claims against United.

4

limit its execution on the underlying judgment against Jones to 75% of any amounts Jones ultimately recovered from Colony. In other words, in order to encourage Jones to pursue a recovery from Colony, the Estate agreed to split any such recovery 75/25 with Jones, and that the Estate would not further execute on its judgment.

Meanwhile, Colony filed a motion for judgment on the pleadings under Rule 12(c). In its motion, Colony advanced essentially the same argument as United had in its motion to dismiss—that the Estate had no standing to assert contractual or bad-faith claims against Colony. The district court granted Colony's motion as to all of the Estate's claims except for its claim for garnishment. The court concluded that Oklahoma law pertaining to foster children did not clearly confer standing upon the Estate, as a third-party claimant, to assert contractual or bad-faith claims against an insurer. The district court distinguished the statutory contexts of workers' compensation and uninsured motorist insurance, in which the Oklahoma Supreme Court has found such standing.

In the proceedings below, the Estate twice moved to certify to the Oklahoma Supreme Court the question of whether, under Oklahoma law, foster-family liability policies such as United's and Colony's are intended to protect foster children such that foster children are third-party beneficiaries with standing to sue the insurance carrier for breach of contract and bad faith. Although the district court expressed its willingness to consider certification, it ultimately denied both motions to certify.[2]

---

[2] The minute order simply stated that "[u]pon further review," the Estate's motion was denied. Aplt. App. at 525.

At a private mediation among the parties in December 2008, Colony and Jones reached a settlement, which they formalized in a May 2009 settlement agreement. Under the settlement agreement, Colony agreed to dismiss its claims against Jones and to pay Jones $4 million. Of that $4 million, $300,000 was expressly designated as the limits of the Colony policy. Jones, in turn, agreed (1) to dismiss her counterclaims against Colony and to release Colony from any and all claims under the policy; (2) to pay the Estate 75% of the settlement amount in accordance with the previous settlement agreement between Jones and the Estate; and (3) to use reasonable efforts to obtain from the Estate a full release of the judgment in the underlying state action. After reaching this settlement, Colony paid the settlement amount to Jones, and Jones paid close to $3,000,000 to the Estate in accordance with the earlier settlement agreement. Colony and Jones dismissed their claims against each other, with prejudice, on May 15, 2009.

Colony subsequently filed a motion for summary judgment on the Estate's remaining garnishment claim. Colony argued, inter alia, that because any garnishment claim the Estate may have had was limited to the policy limits of Colony's policy, the Estate's garnishment claim was extinguished by Colony's payment to Jones (and Jones' subsequent payment to the Estate) of an amount far in excess of the policy limits. The Estate filed a motion under Rule 56(f) for more time to respond so that it could conduct discovery; however, the court denied this motion, finding that the requested discovery was not relevant to the remaining garnishment issue. Ultimately, the district court

6

granted the summary judgment motion and entered judgment in favor of Colony. The

Estate timely appealed.[3]

The Estate has filed an original motion with this Court to certify to the Oklahoma

Supreme Court the question of a foster child's relationship to the foster parent's liability

insurer. The Estate and Colony have also filed motions to file certain documents under

seal, which the Clerk provisionally granted, with a final decision to be made by this

panel.

## II.    DISCUSSION

**A.    Colony's motion for judgment on the pleadings on the Estate's contractual and bad-faith claims**

The district court granted Colony's motion for judgment on the pleadings as to all

of the Estate's counterclaims except its counterclaim for garnishment.[4] In so doing, the

district court concluded that "under Oklahoma law, the Estate did not have status as a

third party beneficiary to the insurance policy at issue."[5] Aple. Supp. App. at 1101. The

Estate maintains on appeal that it is a third-party beneficiary, and that it has a sufficient

---

[3] In its notice of appeal, the Estate listed several of the district court's orders below, but as finally briefed and presented to this Court on appeal, the Estate challenges aspects of the district court's decisions with respect to (1) judgment on the pleadings on the contractual and bad-faith claims; (2) certification to the Oklahoma Supreme Court; (3) summary judgment on the garnishment claim; and (4) the Estate's Rule 56(f) motion.

[4] The minute order reflecting this ruling did not reflect the granting of Colony's motion with respect to the Estate's counterclaim for reformation. But in a subsequent order, the district court made clear that it had granted judgment on the pleadings as to the reformation counterclaim as well. The district court's decision on the reformation counterclaim is not at issue in this appeal.

[5] The parties agree that Oklahoma law applies to the Estate's counterclaims.

7

contractual and statutory relationship with Colony to permit it to maintain its contract and bad faith claims. We reject the Estate's argument, and AFFIRM the district court.

"We review a district court's grant of a motion for judgment on the pleadings de novo, using the same standard that applies to a Rule 12(b)(6) motion." Park Univ. Enters. v. Am. Cas. Co., 442 F.3d 1239, 1244 (10th Cir. 2006). "[W]e accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." Id. A motion for judgment on the pleadings "should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Id. (internal quotation marks omitted).

The dispositive issue with respect to Colony's motion for judgment on the pleadings is whether Aurora, as a foster child (and thus the Estate here), has standing[6] to

---

[6] To be clear, the term "standing," as used by the parties and the controlling case law in this appeal, and hence throughout this opinion, is meant in its ordinary sense of statutory or contractual standing—i.e., being in a position to assert or enforce legal rights or duties—and not in the sense of Article III standing. This type of standing goes to the merits of the claim and not the jurisdiction of this Court to hear it in the first instance. See Blanchard 1986, Ltd. v. Park Plantation, LLC, 553 F.3d 405, 409 (5th Cir. 2008) ("This question of whether or not a particular cause of action authorizes an injured plaintiff to sue is a merits question, affecting statutory standing, not a jurisdictional question, affecting constitutional standing."); Novartis Seeds, Inc. v. Monsanto Co., 190 F.3d 868, 871 (8th Cir. 1999) (recognizing that statutory standing "is entirely distinct from 'standing' for purposes of Article III").

No one contests that the Estate has Article III standing to bring its claims, and we are satisfied that the Estate does. The three requirements of Article III standing—injury-in-fact, causation, and redressability—ensure that the parties to any litigation have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." Massachusetts v. E.P.A., 549 U.S 497, 517 (2007). The Estate alleged

8

pursue contractual and bad-faith claims against Colony, as a provider of foster-parent liability insurance.

"Every contract in Oklahoma contains an implied duty of good faith and fair dealing," a breach of which gives rise to an action for breach of contract. Wathor v. Mut. Assurance Adm'rs, Inc., 87 P.3d 559, 561 (Okla. 2004). In addition, because of the "special relationship" that exists between an insurer and its insured, an insurer's breach of its duty of good faith and fair dealing to its insured "gives rise to a separate cause of action sounding in tort." Id. at 562. However, there is "no duty for an insurance company to deal fairly and in good faith with an injured third party." McWhirter v. Fire Ins. Exch., 878 P.2d 1056, 1059 (Okla. 1994). Thus, an "injured third party [cannot] maintain an action against the tortfeasor's insurer for bad faith negotiations and for failure to settle claims fairly and in good faith." Id. at 1058; see also Townsend v. State Farm Mut. Auto. Ins. Co., 860 P.2d 236, 237 (Okla. 1993) ("Standing to bring such an action . . . has been denied to third-party claimants who are mere strangers to the contract of insurance.").

Third parties may have standing to bring contractual or bad-faith claims against an insurer, however, where there is "a contractual or statutory relationship" between the insurer and the third party. McWhirter, 878 P.2d at 1058; see also Anderson ex rel. Anderson v. Am. Int'l Specialty Lines Ins. Co., 38 P.3d 240, 241 (Okla. Civ. App. 2001) ("There must be either a contractual or statutory relationship between the insurer and the

_____

that it was injured by Colony's breach of contract and breach of the duty of good faith and fair dealing. A favorable decision by the court would have redressed those injuries.

9

party asserting the bad faith claim before the duty arises.").  As discussed below, the

Estate cannot show that Aurora had either a contractual or statutory relationship with

Colony sufficient to permit the Estate to bring claims for breach of contract or bad-faith

breach of duty.

1.	**There Is No Contractual Relationship Between Colony and Foster Children Like Aurora.**

a.	**As a third-party claimant under a liability policy, the Estate is a stranger to the insurance contract.**

At the outset we distinguish between first-party insurance policies, such as life

insurance or health insurance policies, which pay benefits to the insured or the insured's

designated beneficiary in the event of a covered loss or injury; and third-party liability

insurance policies, which pay benefits to a third party to whom the first-party insured has

become liable.  The Colony policy is of this latter type: it provides that Colony "will pay

those sums that <u>an insured becomes legally obligated to pay</u> as damages because of

'bodily injury' or 'property damage' to which this insurance applies."[7]  Aple. Supp. App.

at 660 (emphasis added).

The parties do not squarely address whether a foster child is a first-party "insured"

under the Colony policy.  If a foster child is not an "insured," then the Estate's only status

is as a third-party claimant, and "because third party claimants (as distinguished from

third party beneficiaries) are strangers to the insurance contract, they cannot bring a bad

---

[7] The Colony policy is a first-party insurance policy in one respect only: it covers "'property damage' to property of an insured unintentionally caused by" a foster child, up to $5,000.  Aple. Supp. App. at 665.

10

faith action."[8]  Niemeyer v. United States Fid. & Guar. Co., 789 P.2d 1318, 1322 (Okla. 1990).

The policy's Declarations identify the "Named Insured" as "'Foster Parents' licensed and/or certified under the [DHS]," and the policy also identifies the insured as including "[p]ersons under the age of 18 in the care and custody of th[e] Named Insured." Aple. Supp. App. at 658, 666.  However, the critical point is that, because the policy is a liability policy, even if a foster child is an "insured" under the policy, the foster child is contractually covered, and thus a "first party," only with respect to claims by others against the foster child, not claims brought by the foster child against another insured. By way of illustration, in Coyle v. State Farm Fire & Cas. Co., No. 96-7116, 1997 WL 423118 (10th Cir. 1997) (unpublished), this Court refused to find that an insurer owed its insured a duty of good faith and fair dealing when the insured made a claim in the capacity of a third-party liability claimant.  See id. at *1 ("The fortuitous fact that an insured person is making a liability claim against a policy of insurance under which that person is also an insured is not the factor that determines either the nature of the claim or the duty owed the claimant.  To find a duty in this situation would be an improper expansion of Oklahoma law.").  We are persuaded by Coyle's reasoning and adopt it here.  In other words, where a person making a third-party claim under a given liability policy also happens to be an insured, the insurer's duty to that person, with respect to that claim, is defined not by the person's status as insured, but by the person's status as

_____

[8] As discussed further, infra, the Estate is not a third-party beneficiary of the insurance contract.

11

claimant. See also Smith v. Allstate Ins. Co., 202 F. Supp. 2d 1061, 1067 (D. Ariz. 2002) ("[A]n individual is a third-party claimant when she is injured by a coinsured's negligence and she claims liability benefits under a jointly owned insurance policy.").

### b. The Estate is not a third-party beneficiary with standing to enforce the Colony policy.

To determine whether a third-party claimant is also a third-party beneficiary with standing to bring a bad faith claim against an insurer, "one must consider the contracting parties' primary intent as reflected in the policy." Anderson, 38 P.3d at 241. Although "[i]t is not necessary that [a third] party be specifically named as a beneficiary" in order to have standing, the contract must be made "expressly" for the third party's benefit, which "means in an express manner; in direct or unmistakeable [sic] terms; explicitly; definitely; directly." Keel v. Titan Const. Corp., 639 P.2d 1228, 1231 (Okla. 1981) (internal quotation marks omitted); accord Okla. Stat. tit. 15, § 29 ("A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."). Thus, for example, where a life insurance policy expressly designates a third party as a beneficiary of the policy, the third-party beneficiary may assert a bad-faith claim against the insurer. See Roach v. Atlas Life Ins. Co., 769 P.2d 158, 162 (Okla. 1989) ("An action for breach of the duty of good faith and fair dealing lies in favor of a policy beneficiary against a life insurance company."). However, "[t]he benefit cannot be enforced if it has to be implied from the terms of the contract or results incidentally from its performance." Oil Capital Racing Ass'n, Inc. v. Tulsa Speedway, Inc., 628 P.2d 1176, 1179 (Okla. Civ. App. 1981).

12

Here, the Colony policy does not "in direct or unmistak[]able terms" <u>Keel</u>, 639

P.2d at 1231, indicate that foster children are third-party beneficiaries, nor that the

primary purpose of the policy is to provide for recovery by foster children.[9]  The Estate

argues that the policy's language identifies the foster child as an intended beneficiary of

coverage because (1) the policy provides coverage against "bodily injury" and "personal

injury"[10] resulting from an "occurrence," and (2) the policy defines "[o]ccurrence" as "an

act, error or omission of an insured, arising out of a Named Insured's activities as a

'foster parent' and occurring while one or more 'foster children' is in the care and

custody of a Named Insured."  Aplt. App. at 671.  According to the Estate, because

coverage is triggered when a foster parent "fails in her activities as a foster parent," and a

foster child is necessarily "the recipient of the foster parent's activities," this indicates

that "it is the foster child who is the primary focus of the protection."  Aplt. Br. at 17-18

(internal quotation marks omitted).

This argument is unavailing.  Even if the Estate's characterization of this policy

language can be given some credence, this does not constitute the requisite "direct" or

"unmistakable" designation of foster children as third-party beneficiaries of the policy.

See <u>Keel</u>, 639 P.2d at 1231.  The Estate's interpretation must be "implied from the terms

of the contract," <u>Oil Capital Racing Ass'n, Inc.</u>, 628 P.2d at 1179, and foster children

---

[9] The record is unclear on, and the parties do not state, precisely who the parties to the insurance contract are.  It is likely that DHS and Colony were the contracting parties—DHS, in fact, is identified as the "Licensing Authority" of the contract.  Aple. Supp. App. at 658.

[10] The "personal injury" coverage of the policy is inapplicable, covering as it does only non-bodily injury arising out of certain specified torts.

13

would only "incidentally" benefit from the policy, in those (presumably rare) cases where the foster child has obtained a judgment against her own foster parent. Consequently, there is no third-party benefit that the Estate is entitled to enforce. See id.

In short, the Estate has not demonstrated any clear contractual relationship between Colony and foster children under the policy such that a foster child, acting as a third-party claimant, may assert contractual or bad-faith claims against her foster parent's liability insurer.

**2.    There is no statutory relationship between Colony and Aurora sufficient to confer standing on the Estate.**

**a.    Oklahoma case law does not support a statutory relationship.**

Even where an injured third party is not an express contractual third-party beneficiary of an insurance contract, she might nevertheless be able to enforce the contract if there is a sufficient statutory relationship between the injured third party and the insurer. See Goodwin v. Old Republic Ins. Co., 828 P.2d 431, 433-35 (Okla. 1992) (holding injured workers are third-party beneficiaries of workers' compensation insurance policies by virtue of relevant Oklahoma statutes). The Estate argues that "Oklahoma law has long recognized that certain classes of third parties qualify as third-party beneficiaries . . . if the principal purpose of the insurance is the protection of the third-party," Aplt. Br. at 13, and that various Oklahoma statutes indicate the principal purpose of foster-parent liability insurance is the protection of foster children. In support, the Estate cites cases in which Oklahoma courts have allowed bad-faith claims brought by life insurance beneficiaries, automobile passengers covered by uninsured motorist

14

("UM") policies, and employees covered by workers' compensation policies. The Estate also cites provisions of the Oklahoma Children's Code ("OCC"), the Oklahoma Administrative Code ("OAC"), and other Oklahoma statutes to show that the principal purpose of Colony's policy is to protect foster children. Again, we are unpersuaded.

The three cases the Estate cites are distinguishable in one critical respect. They all address "first-party" policies, in which the plaintiff asserting the bad-faith claim was an express, intended beneficiary of the policy. Colony's policy, as a third-party liability policy, did not pay first-party benefits even to foster parents, let alone to foster children. In Roach, the Oklahoma Supreme Court addressed the status of the named beneficiary of a life insurance policy, and held that "[a]n action for breach of the duty of good faith and fair dealing lies in favor of a policy beneficiary against a life insurance company." 769 P.2d at 162. The court found that "a substantial reason for the insured's purchase of" a life insurance policy is "the peace of mind and security which it provides in the event of loss." Id. In other words, the very purpose of a first-party life insurance policy is to provide first-party coverage for the named beneficiaries in the event of a loss. The Colony policy, as discussed above, is a third-party liability insurance policy, the purpose of which is to protect the named insured against claims by third parties. It is not a policy providing first-party coverage for foster children in the event of the foster child's loss.

In Townsend, the Oklahoma Supreme Court held that a passenger of a car, who was a "Class 2 insured" under the owner's UM policy, had standing to bring a bad-faith claim against the insurer because the passenger had both a contractual and statutory relationship with the insurer. 860 P.2d at 238. First, the court found that the named

15

insured of the policy (the owner of the car) had purchased protection from uninsured motorists not only for himself, but also for passengers of his car as well. Id. "This gave rise to a legitimate contractual expectation that the insurer would act in good faith and deal fairly with all insureds, whether they were of a class 1 or class 2." Id. Second, the court found that an Oklahoma statute mandating uninsured motorist coverage "require[d] insurers to offer uninsured motorist coverage 'for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles.'" Id. (quoting Okla. Stat. tit. 36, § 3636). The court found that "[b]y this provision, the legislature established a statutory relationship between the insurer and all insureds." Id. The special statutory relationship between UM insurers and their insureds is not present in this case.[11]

Finally, in Sizemore v. Cont'l Cas. Co., 142 P.3d 47 (Okla. 2006), the Oklahoma Supreme Court found that "[w]orkers in Oklahoma enjoy both a contractual and a statutory status as third party beneficiaries of a workers' compensation insurance agreement." Id. at 51. Specifically, the court found that under Oklahoma's Workers' Compensation Act, every insurance contract issued for the purpose of insuring an employer against liability under the Act "shall be conclusively presumed to be a contract

---

[11] Indeed, in Gianfillippo v. Northland Cas. Co., 861 P.2d 308 (Okla. 1993), the Oklahoma Supreme Court distinguished Townsend on this basis, holding that an injured third party seeking to recover under a driver's liability policy (as opposed to the driver's uninsured motorist policy) "did not enjoy the statutory relationship that Townsend enjoyed." 861 P.2d at 310. Accordingly, the Gianfillippo plaintiff could not maintain her bad faith action against the driver's insurer. See id. That is precisely the situation here. The Colony policy was a contract to defend and indemnify Jones, the named insured, against liability claims by third parties, and not a first-party policy to compensate losses.

16

for the benefit of" employees, and that such contracts "may be enforced by such employee as the beneficiary thereof." Id. Accordingly, the court concluded that under workers' compensation policies, "the right to enforce the insurance agreement, and the attendant duty of good faith and fair dealing implied in that contract, belongs to the injured worker." Id. Again, and as discussed further below, there is no such explicit statutory mandate in this case, nor do any other Oklahoma statutes indicate that the primary purpose of this insurance policy is to provide for first-party coverage for foster children. Thus, there is no statutory relationship between foster children and foster-parent liability insurers as exists in the UM and workers' compensation contexts.

### b. Oklahoma statutes do not create a statutory relationship.

The Estate cites numerous Oklahoma statutes and regulatory provisions in an attempt to show that foster-parent liability policies such as Colony's were intended primarily to protect foster children.[12] But we do not believe that these statutory and regulatory provisions support such a conclusion.

First, the Estate cites a provision of the OCC,[13] which provides that "[i]t is the policy of this state to provide for the protection of children who have been abused or neglected and who may be further threatened by the conduct of persons responsible for

---

[12] Although the parties sometimes cite to current versions of the statutes and regulations, many have been amended since the events underlying this appeal, including a significant amendment in 2009. We refer to versions then in effect wherever possible; but in any event, the differences between the statutes and regulations then and now are not material to this analysis.

[13] The Oklahoma Children's Code is now codified at Okla. Stat. tit. 10A, § 1-1-101 et seq.

17

health, safety or welfare of such children," and that "[i]t is the intent of the Legislature that the paramount consideration in all proceedings within the Oklahoma Children's Code is the best interests of the child." Okla. Stat. tit. 10A, § 1-1-102(E).[14] But this general provision does not address insurance coverage at all.

Next, the Estate cites a provision of the OAC stating that "[l]iability insurance is provided for [foster families] for damages incurred by children in OKDHS custody," Okla. Admin. Code § 340:75-7-65(j), and contends that "incurred by" in this subsection means "sustained by." Aplt. Br. at 15-16; Aplt. R. Br. at 4-7. But that regulation does not indicate that this liability coverage is intended to benefit the foster child. Instead, as liability insurance, it protects the foster family from liability.

Finally, the Estate points out that (1) the OCC mandates insurance coverage, see Okla. Stat. tit. 10, § 7204 (2001) (providing that the DHS, "in implementing the foster care program within its jurisdictional area, shall . . . [p]rovide for insurance coverage");[15] (2) another Oklahoma statute indicates that property and casualty insurance, which would include liability coverage, may be provided to cover "injuries or damages arising from the foster care relationship and the provision of foster care services," Okla. Stat. tit. 74, § 85.58J(A)(2) (2001); and (3) foster care is defined as including "the care, supervision,

---

[14] Prior to 2009, this language appeared at Okla. Stat. tit. 10, § 7001-1.2, a section titled "Liberal construction of act." Okla. Stat. tit. 10, § 7001-1.2(B) (2001) ("The paramount consideration in all proceedings concerning a child alleged or found to be deprived is the health and safety and the best interests of the child.").

[15] This section was completely amended in 2009, and no longer references insurance. See Okla. Stat. tit. 10A, § 1-7-108.

guidance, and rearing of a foster child by the foster parent," id. tit. 10, § 7203(2) (2001).[16]

These statutes, even read together, do not indicate that the provision of liability coverage to the foster parent is intended or required to benefit the foster child. Instead, it could protect the foster parent from liability resulting from the foster care arrangement.[17] This case cannot be decided by the types of insurance policies DHS was authorized to purchase. It must be decided by the type of insurance policy DHS in fact purchased, and the type of policy Colony in fact wrote. It cannot be said that the Oklahoma legislature

---

[16] This language is now set forth in Okla. Stat. tit. 10A, § 1-1-105.

[17] In its reply brief, the Estate asserts that federal law also indicates that the primary intent of foster-parent insurance is the protection of foster children. For example, the Estate cites 42 U.S.C. § 675, which defines "foster care maintenance payments" as "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." 42 U.S.C. § 675(4)(A) (emphasis added). The Estate argues that because DHS's foster-care program is federally funded, the inclusion of "liability insurance with respect to a child" in 42 U.S.C. § 675(4)(A) indicates that policies such as Colony's were primarily intended to benefit foster children. To support this argument, the Estate cites out-of-circuit authority in which courts have found (1) that "foster care maintenance payments" do not constitute taxable income to a foster family because foster children are the third-party beneficiaries of such maintenance payments, and (2) that certain provisions of the federal Adoption Assistance and Child Welfare Act, 42 U.S.C. § 670 et seq., create rights that foster children could enforce against a state under 42 U.S.C. § 1983.

These arguments are unavailing. First, the Estate did not raise these arguments in its opening brief, and so they are waived. See City of Colo. Springs v. Solis, 589 F.3d 1121, 1135 n.5 (10th Cir. 2009) ("[A]rguments not raised in the opening brief are waived."). Second, nothing in the language of 42 U.S.C. § 675(4)(A), nor any case cited by the Estate, supports the Estate's argument that foster children are intended third-party beneficiaries of liability insurance policies like Colony's. The fact that the broad definition of "foster care maintenance payments" includes liability insurance "with respect to a child" adds little, if anything, to the Estate's attempt to find a statutory relationship between insurers and foster children sufficient to confer standing on the latter. What might be included in a "foster care maintenance payment" does not control over the type of policy that Colony wrote and DHS purchased.

19

has created the same type of relationship between the foster children and foster parent liability insurer as it has, for example, between injured passengers and UM insurers, or injured employee and workers' compensation insurers.

In short, the Estate has not shown a contractual or statutory relationship between Colony and foster children sufficient to confer standing upon the Estate to bring contractual or bad-faith claims against Colony. The Estate is a stranger to the contract and, in this context, is only a third-party claimant. No statute or statutes create the requisite relationship. Accordingly, the district court properly entered judgment on the pleadings in favor of Colony on the Estate's claims for breach of contract and breach of the duty of good faith and fair dealing, and we AFFIRM.

**B.     The Estate's motion to certify to the Oklahoma Supreme Court the question of a foster child's standing to bring suit against the liability insurer of her foster parent**

In the proceedings below, the Estate moved to certify to the Oklahoma Supreme Court the question of whether, under Oklahoma law, foster-family liability policies are intended to protect foster children such that foster children are third-party beneficiaries with standing to sue for breach of contract and bad faith. Although the district court initially expressed its tentative willingness to consider certification, going so far as to state "the only way you're going to have a definitive answer is to go to the Oklahoma Supreme Court," and that the court would "be willing to certify this on an interlocutory basis to the Oklahoma Supreme Court to get an answer," Aplt. App. at 447, the district court nevertheless ultimately denied the Estate's motion to certify, in a minute order, and

20

without elaboration.[18] The Estate appeals the district court's denial of its motion, and moves separately in this Court to certify the following question:

> In Oklahoma, does a foster child, or a foster child's guardian or Estate, have standing as a third-party statutory and/or contractual beneficiary to bring a direct action for breach of contract and/or bad faith against an insurer who issues foster family insurance to the State of Oklahoma pursuant to Oklahoma statutes, administrative code, and case law?

(Nov. 1, 2010 Mot. at 2.) Because we conclude this question is not sufficiently novel to warrant certification, the Estate's motion is DENIED, and the district court's ruling is AFFIRMED. See Anderson, 38 P.3d at 241; McWhirter, 878 P.2d at 1059; Gianfillippo, 861 P.2d at 310; Townsend, 860 P.2d at 237; Niemeyer, 789 P.2d at 1322; Keel, 639 P.2d. at 1231.

### 1. Standard of review

Although this Court reviews a district court's decision not to certify a question of state law for abuse of discretion, Copier ex rel. Lindsey v. Smith & Wesson Corp., 138 F.3d 833, 838 (10th Cir. 1998), where, as here, a motion for certification is "brought independently and anew to the court of appeals," we must "determine whether certification is appropriate as a de novo matter without regard to the district court's assessment." Pino v. United States, 507 F.3d 1233, 1235 (10th Cir. 2007). Thus, we consider the Estate's motion de novo.

### 2. Analysis

---

[18] The minute order simply stated that "[u]pon further review," the Estate's motion was denied. Aplt. App. at 525.

21

Tenth Circuit Rule 27.1 provides that "[w]hen state law permits, this court may . . . certify a question arising under state law to that state's highest court according to that court's rules." 10th Cir. R. 27.1(a). Under Oklahoma law, the Supreme Court of Oklahoma may answer a question of law certified to it "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling decision of the Supreme Court or Court of Criminal Appeals, constitutional provision, or statute of this state." Okla. Stat. tit. 20, § 1602. Accordingly, this Court will "employ the device in circumstances where the question before us (1) may be determinative of the case at hand and (2) is sufficiently novel that we feel uncomfortable attempting to decide it without further guidance." Pino, 507 F.3d at 1236.

However, "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law." Armijo v. Ex Cam, Inc., 843 F.2d 406, 407 (10th Cir. 1988). "Absent 'some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred,' federal courts bear a duty to decide questions of state law when necessary to render a judgment." Kan. Judicial Review v. Stout, 519 F.3d 1107, 1119 (10th Cir. 2008) (quoting Copier, 138 F.3d at 838). Indeed, "under the diversity statutes the federal courts have the duty to decide questions of state law even if difficult or uncertain." Copier, 138 F.3d at 838. Thus, "we apply judgment and restraint before certifying," and "will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks." Pino, 507 F.3d at 1236. "When we see a reasonably clear and principled course, we will seek to follow it ourselves." Id.

22

In this case, the course is reasonably clear. While the question of whether foster children have standing to bring contractual or bad-faith claims against insurers of foster-parent liability policies is determinative of Colony's motion for judgment on the pleadings, it does not appear "sufficiently novel that we feel uncomfortable attempting to decide it without further guidance." Id. As discussed in detail in Part II.A., supra, neither the terms of the policies nor the statutes cited by the Estate indicate that the purpose of the kind of policy written by Colony is to protect foster children, such that foster children have standing to enforce the policy or to sue for bad faith. While no Oklahoma court has yet addressed this precise question, we believe that the state court would agree with the district court's conclusion in this case that foster children, and thus the Estate, do not have standing to bring such claims in this context. See Anderson, 38 P.3d at 241; McWhirter, 878 P.2d at 1059; Gianfillippo, 861 P.2d at 310; Townsend, 860 P.2d at 237; Niemeyer, 789 P.2d at 1322; Keel, 639 P.2d. at 1231. Accordingly, we DENY the Estate's Rule 27.1 motion and AFFIRM the district court's denial of the Estate's motion to certify below.

C.      **Colony's motion for summary judgment on the Estate's garnishment claim**

In its garnishment counterclaim against Colony, the Estate, as Jones's judgment creditor, sought to garnish the Colony insurance policy. The district court granted Colony's motion for summary judgment on the garnishment claim, finding that the settlement between Jones and Colony had extinguished Jones's claims against Colony and thus extinguished the Estate's garnishment claim, and further that under Oklahoma law, a judgment creditor with a bad faith claim may not proceed in garnishment against

23

an insurer for more than the policy limits. On appeal, the Estate maintains that it is entitled to proceed in garnishment against Colony for an amount in excess of the policy limits, because it is a third-party beneficiary whose rights have vested. We have already concluded that the Estate was not a third-party beneficiary of the Colony insurance policy, and conclude further that summary judgment was properly granted on the garnishment claim, although for slightly different reasons than the district court.

### 1. Standard of review

This Court reviews the district court's grant of summary judgment de novo, and accords no deference to the district court's decision. Weber v. GE Grp. Life Assur. Co., 541 F.3d 1002, 1010 (10th Cir. 2008). Under Federal Rule of Civil Procedure 56, as in effect at the time defendants' motions were decided, summary judgment was to be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show[ed] that there [wa]s no genuine issue as to any material fact and that the movant [wa]s entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2) (2009).[19] As this Court explained in Shero v. City of Grove,

> Judgment as a matter of law is appropriate when the nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The question then is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. [O]n summary judgment, the inferences to be

---

[19] Rule 56 was amended effective December 1, 2010; however, the Rule still provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010).

24

drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.

510 F.3d 1196, 1200 (10th Cir. 2007) (internal quotation marks and citations omitted).

## 2.    Analysis

Under Oklahoma law, a creditor "shall be entitled to proceed by garnishment in any court having jurisdiction against any person who shall be indebted to the creditor's debtor or has any property in his possession or under his control belonging to such creditor's debtor, in the cases, upon the conditions, and in the manner described by law." Okla. Stat. tit. 12, § 1171.  In a garnishment proceeding "the judgment creditor stands in the shoes of the judgment debtor to enforce a liability owed to the latter by a third party." Culie v. Arnett, 765 P.2d 1203, 1205 (Okla. 1988) (emphasis added).  The judgment creditor "may claim no greater rights against the garnishee than the [judgment debtor] himself possesses." Id.  In other words, the garnishee must have some established liability to the judgment debtor before the judgment creditor can enforce that liability.

But Colony was never liable to Jones for more than the policy limits.  Although an insurance contract by its terms limits the insurer's liability to the stated policy limits, "an insurer that breaches its duty to consider settlement offers in good faith may be held liable for the entire judgment obtained against the insured, regardless of policy limitations." Magnum Foods Inc. v. Cont'l Cas. Co., 36 F.3d 1491, 1504 (10th Cir. 1994) (citing Am. Fidelity & Cas. Co. v. L.C. Jones Trucking, 321 P.2d 685, 687 (Okla. 1957), overruled on other grounds by Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1093-94, 1094 & n.7 (Okla. 2005)).  Under this rule, however, an insurer's liability for a

25

judgment in excess of the policy limits is premised on a finding of bad faith. The cases cited by the Estate for the proposition that a judgment creditor of an insured may proceed in garnishment against an insurer for amounts in excess of the policy limits are fully in accord. Each of them recognized that the insurer's liability for an excess judgment is triggered by a finding of bad faith. See Moses v. Halstead, 581 F.3d 1248, 1255 (10th Cir. 2009); Nichols v. Marshall, 491 F.2d 177, 183 (10th Cir. 1974).[20]

Here, there was never any such finding of bad faith, nor does the record support any such conclusion. Although Jones asserted a bad-faith counterclaim against Colony, no court or jury ever found Colony had acted in bad faith, and indeed Jones dismissed the bad-faith claim, with prejudice, as part of her settlement with Colony. Thus, notwithstanding the fact that Colony ultimately settled with Jones for an amount far in excess of the policy limits, Colony was never legally liable to pay Jones any more than the policy limits. The policy limits, therefore, were the only liability the Estate was entitled to enforce against Colony through garnishment. See Culie, 765 P.2d at 1205. The Estate received the policy limits and more.[21] The Estate has no remaining garnishment claim.[22]

---

[20] To the extent these cases apply Kansas law, and not Oklahoma law, they are even less helpful to the Estate.

[21] The Estate argues, without citing to any legal authority, that even though (1) the settlement agreement between Jones and Colony expressly designated $300,000 of the settlement as the policy limits; (2) the settlement agreement required Jones to pay the Estate "pursuant to the terms and conditions stated in" the separate agreement between Jones and the Estate, Aple. Supp. App. at 1194; and (3) it is undisputed that the Estate received an amount of money in excess of the policy limits, somehow the money the Estate received did not actually constitute the policy limits.

26

Moreover, the practical effect of Jones's performance of the agreement between Jones and the Estate was to release Jones from her debt to the Estate. Under the terms of that agreement, the Estate agreed to "execute with regard to the Judgment only on monies collected by Jones, if any, against Colony . . . ," Aple. Supp. App. at 1203, and further to limit such execution to 75% of such monies collected. In other words, the Estate agreed to accept 75% of whatever Jones recovered from Colony (after deduction for litigation costs), and that the Estate would not try to collect any more from Jones, for example by attaching her wages or home. In exchange, Jones continued to pursue her bad-faith claim against Colony and she dismissed her appeal of the underlying judgment. Although the Estate argues that it "had no choice but to agree," Aplt. Br. at 6, to these terms, the Estate has not sought to set aside the agreement as invalid. Jones recovered $4 million from

Aside from the fact that this Court need not entertain arguments unsupported by legal authority, see United States v. Banks, 451 F.3d 721, 728 (10th Cir. 2006), the district court, in granting summary judgment to Colony, expressly found that the Estate had recovered in excess of the policy limits. This Court will not overturn the district court's findings of fact unless they are clearly erroneous. See Fed. R. Civ. P. 52(a)(6); Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985). There is nothing clearly erroneous about the district court's finding.

[22] We also reject the Estate's contention that the payment it ultimately received from Colony, through Jones, was only in "partial satisfaction of [Jones's] still remaining debt to the Estate." Aplt. Br. at 29. As an initial matter, as just explained, a judgment creditor may proceed against a garnishee only to the extent that the garnishee is liable to the judgment debtor. See Culie, 765 P.2d at 1205. The fact that a judgment debtor owes the judgment creditor more than the garnishee is liable for does not mean the judgment creditor may indiscriminately garnish third parties until fully satisfied. The Estate's apparent argument that a garnishment claim still lies against Colony because Jones still owes the Estate more money is meritless.

27

Colony and paid nearly $3 million to the Estate according to the terms of the agreement. This effectively terminated Jones's obligation to the Estate with respect to the judgment.

The district court's grant of summary judgment to Colony on the Estate's garnishment claim is AFFIRMED.[23]

## D.     The Estate's status as an intervenor

As described above, the Estate filed a motion to intervene in Jones's counterclaims against Colony. The Estate sought leave to intervene as of right under Fed. R. Civ. P. 24(a) and, alternatively, to intervene permissively under Fed. R. Civ. P. 24(b). The district court granted the motion nine months later in a minute order without

---

[23] We reject the Estate's argument that this outcome contravenes public policy because it sanctions the "collusive agreement" between Colony and Jones. (Aplt. Br. at 28.) First, as the district court found, the Estate "has presented no evidence of collusion between Colony and Jones," Aple. Supp. App. at 1393, and this finding is not clearly erroneous, see Fed. R. Civ. P. 52(a)(6). The Estate fails to account for the fact that Jones had a 25% stake in her settlement with Colony, and thus it was in Jones's interest to obtain as large a settlement as possible. Moreover, even if the Estate could offer evidence that Jones colluded with Colony to arrive at a lower settlement amount, the Estate's recourse would be to sue Jones for breaching their earlier agreement, which required Jones to pursue her pending counterclaims for breach of contract and bad faith against Colony. Under the circumstances of this case, any action for damages to the Estate arising from Colony's and Jones's decision to settle with each other, and to not include the Estate in their settlement, lies against Jones, not Colony. See McWhirter, 878 P.2d at 1059 ("Inasmuch as we recognize no duty for an insurance company to deal fairly and in good faith with an injured third party, there can be no bad faith claim arising from negotiations of settlement between the two and any evidence to that effect is simply irrelevant. Recourse for a third party claimant to recover his damages is against the tortfeasor/insured.").

28

explanation.[24] The district court did not state whether it was granting intervention as a matter of right under Rule 24(a) or permissively under Rule 24(b).

The Estate now argues that the district court erred by "refus[ing] to acknowledge or address the rights vested in the Estate" as an intervenor. Aplt. Br. at 23. Although the Estate's argument is somewhat unclear, it appears the Estate is not challenging any aspect of the district court's decision to grant the motion to intervene. Rather, the Estate appears to contend that the district court improperly failed to recognize the Estate's intervenor status in connection with (1) Colony's motion for judgment on the pleadings; (2) the Estate's motion under Rule 56(f) for additional time to conduct discovery with respect to Colony's motion for summary judgment on the Estate's garnishment claim; and (3) Colony's motion for summary judgment on the Estate's garnishment claim. Thus, the Estate appears to argue, the district court's adverse rulings on these motions must be reversed. We discern no merit in this argument.

First, the basic purpose of intervention of right is to permit a non-party to protect its otherwise-inadequately-represented interest in the action, by conferring party status

---

[24] Rule 24 provides for both intervention as of right and permissive intervention. Specifically, the Rule states, in relevant part, that on timely motion (1) "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest"; and (2) "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(a)(2), (b)(1)(B). The Estate moved under both provisions of Rule 24, but the district court granted the motion in a minute order without indicating whether it was granting the Estate intervention as of right or permissive intervention.

In this case, of course, the Estate's intervention was atypical, as the Estate was already a party in the action against Colony.

upon the non-party. See Fed. R. Civ. P. 24(a). The rule focuses on "the practical effect of litigation on a prospective intervenor rather than legal technicalities." San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1188 (10th Cir. 2007) (en banc). And in light of these practical considerations, even an intervenor of right—assuming, arguendo, that the district court intended to grant intervention of right—does not have an unlimited right to participate in every aspect of the litigation. See id. at 1189 ("[J]ust because no party will adequately represent one particular interest of the applicant does not mean that the applicant must be allowed to participate in the litigation of other matters concerning which its interests are adequately represented."). In none of the challenged rulings was the Estate's status as intervenor even relevant. The Estate was an intervenor only with respect to Jones's compulsory counterclaims against Colony. All of the challenged rulings addressed motions pertaining to claims or counterclaims directly between the Estate and Colony, and the Estate litigated those motions as an original party, fully able to represent and protect its own interests.[25]

_____

[25] The Estate cites two Oklahoma Supreme Court cases for the proposition that once a party is permitted to intervene, that party may "raise and litigate independent issues" and that such rights "are to be protected the same as the original parties." Aplt. Br. at 24 (citing Teleco, Inc. v. Corp. Comm'n of Okla., 649 P.2d 772 (Okla. 1982), and Tulsa Rock Co. v. Williams, 640 P.2d 530 (Okla. 1982)). However, these cases involve intervention under Oklahoma law, not Rule 24, and the only "issues" that the Estate apparently wants "raise[d] and litigate[d]" under the heading of this argument are the three motions listed above, all of which were raised and litigated before the district court, with the Estate as an original party. The Estate's interests could not have been more adequately represented; its intervenor status was of no practical effect and therefore of no relevance. See San Juan Cnty., 503 F.3d at 1195 (the "practical effect on the prospective intervenor" is what "justifies its participation in the litigation").

Second, even if the Estate's intervenor status were relevant, there is no basis for this Court to disturb the district court's decision on any of the challenged rulings. As discussed above, Colony owed no duty of good faith and fair dealing to the Estate, nor was the Estate a third-party beneficiary entitled to enforce the contract. In addition, the Estate had no remaining garnishment claim against Colony once Colony satisfied its obligations to Jones. Accordingly, the Estate's contractual, bad-faith, and garnishment claims failed on the merits, regardless of whether the Estate was bringing them as a counterclaim-plaintiff or as an intervenor.

The same holds true for the district court's denial of the Estate's Rule 56(f) motion for more time and more discovery to oppose Colony's summary judgment motion.[26] The district court denied that motion because the Estate had failed to meet this Court's test, stated in International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc., 52 F.3d 901, 905 (10th Cir. 1995), for granting a Rule 56(f) motion—that is, the Estate had failed to state with specificity how the additional discovery it sought to undertake was relevant to its opposition of the summary judgment motion. It is worth noting that, unlike with respect to the district court's decisions on the contractual, bad-faith, and garnishment claims, the Estate does not challenge the merits of the district court's decision to deny the Estate's Rule 56(f) motion. Its sole argument on appeal with

_____

[26] What was Rule 56(f) in 2009, when the motion was filed, is now Fed. R. Civ. P. 56(d), but in substance it is unchanged. As it stood in 2009, Rule 56(f) permitted a court considering a summary judgment motion to order a continuance to enable additional affidavits, depositions, or discovery to be obtained by the party opposing summary judgment, provided that the party opposing summary judgment "show[ed] by affidavit that, for specified reasons, it [could not] present facts essential to justify its opposition."

31

respect to the Rule 56(f) motion is that the district court failed to consider its intervenor status. But as we have already made clear, the Estate's status as intervenor in Jones's counterclaims against Colony was wholly irrelevant to the district court's consideration of the Estate's Rule 56(f) motion in connection with the Estate's own counterclaims against Colony.

Accordingly, we reject the Estate's contention that the district court's decisions must be reversed due to the court's purported failure to consider the Estate's status as an intervenor.

## E.    The parties' unopposed motions to file under seal

Each party has filed an unopposed motion to file certain parts of their briefs and appendices under seal, which the Clerk of this Court provisionally granted, with a final decision to be made by this panel. The Estate seeks to seal one attachment to its opening brief and one volume of its four-volume appendix. Colony seeks to seal its response brief and one volume of its four-volume supplemental appendix. We DENY both motions.

"Courts have long recognized a common-law right of access to judicial records," but this right "is not absolute." Mann v. Boatright, 477 F.3d 1140, 1149 (10th Cir. 2007).[27] Thus, the presumption in favor of access to judicial records may be overcome where "countervailing interests heavily outweigh the public interests in access." Id.

---

[27] Although this common law right has long been recognized, "[t]he Supreme Court has not yet ruled on 'whether there is [also] a constitutional right of access to court documents and, if so, the scope of such a right.'" United States v. Gonzales, 150 F.3d 1246, 1256 (10th Cir. 1998) (quoting United States v. McVeigh, 119 F.3d 806, 812 (10th Cir. 1997) (per curiam)).

32

(internal quotation marks omitted). The burden is on the party seeking to restrict access to show "some significant interest that outweighs the presumption." Id. (internal quotation marks omitted).

The parties' only stated reason for filing these documents under seal is that they involve the terms of confidential settlement agreements and/or they were filed under seal in the district court. This Court, of course, is not bound by the district court's decision to seal certain documents below, and retains its own "authority to decide whether the parties may file documents under seal in this Court."[28] Helm v. Kansas, 656 F.3d 1277, 1292 (10th Cir. 2011) (citing Crystal Grower's Corp. v. Dobbins, 616 F.2d 458, 461 (10th Cir. 1980)).

Here, the settlement agreements at issue contain explicit confidentiality provisions, and sealing these materials would further the district court's order maintaining the confidentiality of these documents. See AST Sports Sci., Inc. v. CLF Distrib. Ltd., 514 F.3d 1054, 1057 n.1 (10th Cir. 2008) (granting motion to seal on appeal where district court previously entered protective order restricting disclosure of confidential information). The Court recognizes that preserving the confidentiality of settlement agreements may encourage settlement, and that denying a motion to seal may chill future settlement discussions. However, we are not convinced, in this particular case, that the parties' interests in keeping the terms of their agreements confidential

---

[28] Of course, if the district court's decision to seal documents below were itself on appeal, this Court would review that decision for an abuse of discretion. See Mann, 477 F.3d at 1149 (citing Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978)). Here, however, we have two original motions filed in this Court.

33

outweighs the public interest in access, particularly in light of the centrality of these documents to the adjudication of this case.

The parties themselves placed these settlements at the center of this controversy, in particular through the Estate's garnishment counterclaim and Colony's motion for summary judgment on that counterclaim. This is unlike a situation in which this Court has sealed documents containing the name of and detailed medical information about a minor, where that information was only incidental to the substantive legal issue adjudicated, see Eugene S. v. Horizon Blue Cross Blue Shield of N.J., 663 F.3d 1124, 1135-36 (10th Cir. 2011). "[W]here documents are used to determine litigants' substantive legal rights, a strong presumption of access attaches." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 121 (2d Cir. 2006). "[T]he parties must articulate a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process." Helm, 656 F.3d at 1292. Here, however, "the parties have not come close to meeting that heavy burden." Id. at 1292-93. Neither party has submitted any specific argument or facts indicating why the confidentiality of their settlement agreements outweighs the presumption of public access. We therefore DENY the motions to file under seal.

### III. CONCLUSION

For the foregoing reasons, the district court's judgment is AFFIRMED.

Appellant's motion to certify the question to the Oklahoma Supreme Court is DENIED.

The parties' motions to seal portions of their briefs and appendices are DENIED.