In the

# United States Court of Appeals
### For the Seventh Circuit

---

Nos. 14-1267, 14-1283, 14-1342

UNITED STATES *ex rel.* PILECO, INC.,
*Plaintiff / Counterdefendant-Appellee / Cross-Appellant,*

*v.*

SLURRY SYSTEMS, INC.,
*Defendant / Counterplaintiff-Appellant / Cross-Appellee,*

*and*

FIDELITY & DEPOSIT CO. OF MARYLAND
*Defendant-Appellant / Cross-Appellee.*

---

SLURRY SYSTEMS, INC.,
*Third-Party Plaintiff-Appellant / Cross-Appellee,*

*v.*

BAUER MASCHINEN GMBH,
*Third-Party Defendant-Appellee / Cross-Appellant.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 7459 — **Arlander Keys**, *Magistrate Judge.*

---

ARGUED OCTOBER 2, 2015 — DECIDED OCTOBER 28, 2015

———————————

Before POSNER, SYKES, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. We begin by introducing the parties, and their dealings out of which this case arises. Pileco, the plaintiff and appellee—a wholly owned subsidiary of the other appellee, Bauer—sells and leases machinery for use in construction projects. One of the machines Pileco sells and leases is a trench cutter manufactured by Bauer. It is a huge steel machine—roughly 40 feet high and weighing 40 tons—designed to cut into bedrock. It is moved about by a crane manufactured by a different company. (It has motorized wheels, but they're just used to dig into the ground.)

In 2005 the Army Corps of Engineers invited bids on a federal reservoir project in Illinois. One of the successful bidders was Slurry Systems, Inc. Slurry (as we'll call the company for short) leased from Pileco one of the trench cutters made by Bauer. (For simplicity we'll usually use "Pileco" to denote both the parent and the subsidiary.)

Slurry was a prime contractor on the Corps of Engineers' project and, pursuant to the Miller Act, 40 U.S.C. § 3131 *et seq.*, which requires prime contractors on some government construction projects to post bonds guaranteeing both the performance of the prime contractor's contractual undertakings and the payment by the prime contractor of its subcontractors and material suppliers, had posted the required payment bond using Fidelity & Deposit Co. of Maryland as surety. The bond insured against a failure by Slurry to pay subcontractors, such as Pileco. Contending that the cutter was defective, Slurry refused to pay the agreed rental price

for the cutter's use, and Pileco sued both it and Fidelity for the payment shortfall. Filed in the federal district court in Chicago, Pileco's suit accused Slurry of breach of its contract for the lease of the cutter (and of miscellaneous associated parts, which we can ignore because they don't present distinct issues) in violation of Illinois common law. And it accused Fidelity of violating the Miller Act by failing to reimburse Pileco for costs imposed on it by Slurry's reneging on its obligation to pay Pileco the agreed-upon rental price for the cutter.

The complaint based federal jurisdiction on the section of the Miller Act that authorizes a civil suit to recover money owing under a payment bond for a federal project. 40 U.S.C. § 3133(b). The Miller Act claim also conferred jurisdiction over Pileco's state-law claim against Slurry under the grant of supplemental jurisdiction in 28 U.S.C. § 1367, thus providing a federal jurisdictional basis for the state law claims. The court also had jurisdiction to hear those claims pursuant to 28 U.S.C. § 1332 (diversity).

Slurry counterclaimed, claiming that Pileco had violated the lease and engaged in fraud by supplying a defective cutter. The parties agreed to a jury trial to be presided over by Magistrate Judge Keys. The trial took eight days and resulted in a verdict that awarded Pileco $2 million on its breach of contract claim against Slurry and $1 million on its payment-bond claim against Fidelity, but that also awarded Slurry $600,000 on its breach of contract counterclaim against Pileco. The verdict form had directed the jury, in the event that it awarded Pileco damages, to calculate the damages to which Slurry might be entitled by a provision of the contract that granted Slurry an "equitable adjustment"—an

offset against the rental price—for periods when the cutter had been unusable because of a defect attributable to Pileco. Despite the instruction to determine the equitable adjustment if it awarded damages to Pileco, the jury left the space for the answer to that question in the verdict form blank.

Slurry had also filed a third-party breach of contract claim against Bauer, and the jury awarded $3.4 million on that claim and another $1 million on express and implied warranty claims by Slurry against Pileco and Bauer. Awarding Slurry $600,000 against Pileco for breach of contract but $3.4 million against Bauer for breach of the leasing agreement is perplexing because there was only one contract (the lease of the cutter), for which Pileco served as Bauer's agent, and Bauer's and Pileco's interests and trial strategy were generally aligned. Finally and most dramatically (or absurdly), the jury awarded Slurry $20 million in punitive damages (and nothing in compensatory damages) on a claim by Slurry that Bauer had violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.

So when the dust settled, Slurry had netted $3 million in compensatory damages against Pileco and Bauer ($3.4 million + $1 million + $600,000 – $2 million) and $20 million in punitive damages. The jury had ignored the claim for equitable adjustment despite Pileco's having acknowledged that it had some merit and despite the instruction to the jury to determine an adjustment amount.

The likeliest reason for the bollixed verdict is the jury instructions, the preparation of which the judge had largely left to the rival lawyers. Even after the judge made some alterations, the instructions (including the verdict form) were far too long (57 pages) and technical for a jury to be expected

to understand. The judge and even the parties acknowledged the defects in the instructions after they saw the jury's verdict.

Obviously the verdict couldn't stand. Apart from the jury's having overlooked the issue of equitable adjustment even though it was stated on the verdict form, punitive damages can't lawfully be awarded when no compensatory damages are awarded. Illinois law allows suit only by someone who "suffers actual damage as a result of a violation of" the Consumer Fraud Act, 815 ILCS 505/10a(a); *Avery v. State Farm Mutual Automobile Ins. Co.*, 835 N.E.2d 801, 858–61 (Ill. 2005). The award of zero compensatory damages to Slurry on its fraud claim implied that Slurry had incurred no harm from Bauer—and without proof of "actual damage" punitive damages can't be awarded. *Hayman v. Autohaus on Edens, Inc.*, 734 N.E.2d 1012, 1015 (Ill. App. 2000). Also there are constitutional limits on the ratio of punitive to compensatory damages. See *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 580–83 (1996); *Keeling v. Esurance Ins. Co.*, 660 F.3d 273, 275 (7th Cir. 2011). The ratio of $20 million to zero is not two to one or a hundred to one or 20 million or any other number to one; it is undefined, like any other division by zero.

Judge Keys ordered a retrial, as authorized by Fed. R. Civ. P. 59(d), which empowers a judge to order a retrial on his own initiative "for any reason that would justify granting one on a party's motion." Trial judges are reluctant to order retrials; it's no fun trying the same case over again. But Judge Keys had a compelling reason to do so—the botched verdict. Slurry contends that a new trial wasn't necessary—that the defective verdict could have been fixed by, for example, the judge's granting a remittitur. It's not clear wheth-

er this is true (Slurry didn't ask for a remittitur), but what is more important is that the jury's confused responses to the damages provisions in the verdict form called into doubt the dependability of the jury's other findings.

The new trial, before a new jury, again presided over by Judge Keys, was held four months after the first trial and lasted nine days. This jury's verdict was dramatically different from that of the jury in the first trial—it was entirely in Pileco's favor except for a $357,716 equitable adjustment in favor of Slurry on Pileco's breach of contract claim against it. The net result was that Pileco was awarded $2.23 million against Slurry for breach of contract and the same amount against Fidelity for the Miller Act violation.

Both Slurry and Fidelity asked the judge to set aside the verdict, while Pileco asked him to award it prejudgment interest plus statutory costs. The judge denied these requests.

There are no obvious defects in the second verdict, rendered by a different jury that had been given much better instructions. Pileco had learned from mistakes it had committed at the first trial—the judge remarked that Pileco was "much better prepared and much better organized" the second time around. The first verdict had revealed substantial jury confusion, the second no jury confusion.

Fidelity contends that Pileco's claim against it is invalid because the cutter was built and delivered to Slurry by Bauer, Pileco's parent; only Bauer, therefore, Fidelity argues, could sue it under the Miller Act. No; the rental agreement was between Pileco, Bauer's subsidiary, as agent, and Slurry. It is commonplace for an agent to *arrange* for the delivery of a good that is made, and is to be delivered, by someone else.

Fidelity's argument is that the Miller Act required Pileco to have "furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under" the Act, 40 U.S.C. § 3133(b)(1), and that "furnished" means supplied directly, whereas the cutter was shipped (hence directly supplied) to Slurry by Bauer, not Pileco. But the word "furnish" hasn't so limited a meaning as Fidelity suggests. It's commonly a synonym for "provide" or "outfit." A guest who says to his host "you've furnished your living room very nicely" doesn't mean the host dragged the furniture into the room; employees of a furniture store or a moving company probably did. Similarly, Pileco provided the cutter to Slurry pursuant to the contract between those two firms, albeit Pileco was a middleman between Bauer and Slurry.

Slurry complains that Pileco had promised in the rental agreement that the cutter would be new, in the sense of not having been used yet, and claims that it wasn't new. The evidence on the cutter's newness was mixed. Pileco maintains that apart from the GS500 unit, a component of the desander (a device used to separate solids from fluids used when drilling into the ground), the cutter had not been used previously. And since both parties knew at the time the lease was signed that the GS500 unit had been used previously, its not being new can't affect the analysis.

The evidence on which Slurry relies to dispute the newness of the cutter as a whole consists of data generated by the cutter's B-Tronic software (essentially the cutter's black box). Slurry argues that those data reveal that the cutter had been used since the fall of 2004, two years before the cutter was delivered to Slurry. But in 2004 that "use" consisted on-

ly of rapid start-stop time entries that consumed no more than seven hours during which the cutter's software (and not necessarily any other part of the cutter) had been in use. No significant further use was logged in 2005 or the first half of 2006. The jury was entitled to credit Pileco's explanation that mere software and equipment testing did not "age" the cutter in any sense relevant to the cutter's use in the Corps of Engineers' project.

There is no evidence that *any* problems with the cutter during its lease by Slurry had anything to do with the machine's age. If age had nothing to do with those problems, the violation of the newness clause could not have harmed Slurry—*if* there was a violation, which is uncertain because of the evidence just summarized and also because the meaning of "new" in the lease is uncertain. Does the word mean newly designed, newly manufactured, or never used? (It could mean any of those things.) Obviously the machine had been designed and manufactured before the lease was signed, yet there is no evidence that any of the problems with the machine that Slurry claims to have encountered while working on the Corps of Engineers project were attributable either to the cutter's age or to any prior use. In *Isaiah* we read that "The grass withers, the flower fades, but the word of our God will stand forever." A 40-ton hunk of steel will not stand forever, but neither will it wither like the grass or fade like the flower.

Pileco's cross-appeal asks for two things. One is prejudgment interest, at an annual rate of 5 percent, from the date on which Slurry stopped making payments on the lease. See Illinois Interest Act, 815 ILCS 205/2; *PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 895 (7th Cir. 2004)

(Illinois law). Judge Keys refused to award prejudgment interest, on the ground that Pileco's damages claim was strongly contested and the exact amount to which Pileco was entitled was uncertain, given, for example, the equitable adjustment to which Slurry was entitled. But the jury *awarded* Slurry an equitable adjustment, which the judge had only to subtract from the damages that the jury had awarded Pileco in order to determine the dollar amount to use as a basis for calculating the prejudgment interest. The fact that Slurry had colorable defenses that the jury was entitled to and did reject was irrelevant; Pileco was entitled to prejudgment interest calculated on the basis of the jury award with a deduction only for the equitable adjustment. *Jones v. Hryn Development, Inc.*, 778 N.E.2d 245, 249–50 (Ill. App. 2002); *La Grange Metal Products v. Pettibone Mulliken Corp.*, 436 N.E.2d 645, 652 (Ill. App. 1982); *Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 439 (7th Cir. 1992) (Illinois law).

Pileco asked the judge to award it certain litigation costs, such as filing fees, stenographic fees, and printing and witness fees, all being fees to which the prevailing party in a federal civil case is presumptively entitled by Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920. The judge refused on three grounds. The first was that an analysis of the reimbursement request "would eliminate many of the costs Pileco requests," because many of the items were not recoverable under the statute or not necessary for the litigation. Maybe so, but such an analysis would have to be conducted, which the judge didn't do.

His second reason is that had the first jury done a more careful job in filling out the verdict form he would have rendered judgment in favor of Slurry and then Pileco would not

have been entitled to costs. It's true that the closeness of a case can be a reason for denying an award of costs to the prevailing party in cases in which the losing party is indigent, but only when deciding whether the indigent party should be held liable for his opponent's costs. *Rivera v. City of Chicago*, 469 F.3d 631, 635 (7th Cir. 2006); *Mother & Father v. Cassidy*, 338 F.3d 704, 708 (7th Cir. 2003) ("We have recognized only two situations in which the denial of costs might be warranted: the first involves misconduct of the party seeking costs, and the second involves a pragmatic exercise of discretion to deny or reduce a costs order if the losing party is indigent"). Moreover, the second verdict, the verdict in favor of Pileco, was far more credible than the first. The first jury had not just made a scrivener's error; it had been seriously confused. The second jury had not been confused at all, so far as one can judge, and the outcome of the second case wasn't close at all.

And third the judge said that Slurry (and two of its principals) were in "financial straits … partially because of their dealings with Pileco." The implication is that Pileco was responsible for Slurry's losses on the project. That implication is contrary to the jury's verdict, according to which most of the losses were sustained by Pileco.

The judgment of the district court is affirmed, except with respect to the denial of prejudgment interest and costs. Regarding them the judge's rulings are reversed and the case remanded.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART