**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 25, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

INSIGHT INVESTMENTS, LLC,

    Plaintiff - Appellant/Cross-
    Appellee,

v.

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY,

    Defendant Third-Party Plaintiff -
    Appellee/Cross-Appellant,

and

SASHA M. BELL,

    Third-Party Defendant.[1]

Nos. 24-6068 & 24-6076
(D.C. No. 5:20-CV-00788-G)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **TYMKOVICH**, and **EID**, Circuit Judges.
_____

A subcontractor's labor-and-material payment bond guarantees that all the

subcontractor's bills for labor and materials will be paid by a surety if it defaults. In

this case, a subcontractor, Icon Construction, Inc. (Sub), prepared a modular building

---

[1] Third-Party Defendant Sasha M. Bell is not a party to this appeal.

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

to be used on an Air Force base during renovation of the permanent clinic. It procured a labor-and-material payment bond from North American Specialty Insurance Company (Surety).

While the construction project was underway, Sub entered into a contract with Insight Investments, LLC (Insight) stating that Sub sold the modular building to Insight and Insight then leased it back to Sub. Undisputed facts, however, establish that the true nature of the transaction was that Insight simply financed Sub's performance under its subcontract with the prime contractor. When Sub failed to pay what it owed Insight, Insight made a claim on the bond from Surety. Surety refused to pay, and Insight filed this lawsuit.

There are three issues on appeal: (1) Does the payment bond protect Insight if it was merely financing Sub? (2) For purposes of determining bond coverage, does the parol-evidence rule require the court to adopt the description of the relationship between Sub and Insight in their separate contract, or may the court consider extrinsic evidence? And (3) if the court denies a claim under the bond, is Surety entitled to recover prevailing-party attorney fees under the applicable Oklahoma statute?

On the first question, we hold that Insight is not covered under the bond because it did not provide labor or material, but only money. Next, we hold that the parol-evidence rule governs only the parties to a contract, so Surety was allowed to introduce evidence regarding Sub's actual relationship with Insight. Finally, we hold that Surety is entitled to prevailing-party attorney fees under Okla. Stat. Ann. tit. 12,

2

§ 936 (2025), because the statute requires only that there be an action to recover for unpaid labor or services, not that the action be valid.

## I.    BACKGROUND

### A.    The Construction Project

In September 2016 United Excel Corporation (Prime) entered into a contract with the U.S. Army Corps of Engineers, agreeing to serve as the prime contractor on a project to renovate a medical clinic on Vance Air Force Base in Oklahoma. In April 2017 Prime subcontracted with Sub, whose task was to design, manufacture, and install a modular building (the Module) to serve as a temporary medical clinic while renovation of the existing clinic was underway. Prime was to pay Sub $807,766, including 20 monthly lease payments of $19,000 after installation. If the Module was used beyond the 20-month term, the monthly rate would decrease to $17,250.

Sub began manufacturing the Module at its own facility in late August 2017. The following month, Sub purchased from Surety a "Subcontract Labor and Material Payment Bond" (the Bond). Joint App. at 69. The Bond provided "[t]hat if [Sub] shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the subcontract, then this obligation shall be void; otherwise it shall remain in full force and effect[.]" *Id.* In other words, if Sub promptly paid all claimants, there would be nothing for the surety to cover.

The Bond defines a *claimant* as:

[O]ne having a direct contract with [Sub] for labor, material, or both, used or reasonably required for use in the performance of the contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service, or rental of equipment directly applicable to the subcontract.

*Id.* The Bond permits any *claimant* to sue if it "has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of [its] work or labor was done or performed, or materials were furnished . . . ." *Id.*

From late August through December 2017, Sub manufactured the Module, delivered it to the site, and substantially completed its installation. Prime was then to begin paying Sub monthly rent.

### B.     The Sub-Insight Transaction

In May 2016, more than a year before Sub began working on the project, Insight salesman Reid Lukes sent an email advertising Insight's "financing programs" for modular buildings. *Id.* at 460. In a follow-up email, he said Insight was "just a finance company" that "funds all of [its] modular partners [presumably, those making modular buildings who are financed by Insight] 100% of the project without recourse." *Id.* at 458

In October 2016 Sub contacted Insight to discuss financing for the Module. Ten months later, Lukes requested more details, sending an email asking, "How much were you looking for us to fund?" *Id.* at 466. Eric Salomone, Sub's Vice President, responded, "We were looking for you to fund $511,433 for the building." *Id.* Lukes replied that Insight typically invested a lower percentage of equity, and proposed funding $466,501 instead.

4

These negotiations culminated in late December 2017, when Salomone sent Lukes an email with the final terms:

> [Sub] accepts the revised *up-front funding* of the building at $410,000.00 (from the original $466,501.00). As discussed on the phone, we would like to receive the funding as early as possible. Also, should the lease not get extended beyond the initial 20 month term long enough for [Sub] to recover the remaining $56,501.00 from the original building price via a 50% split of the extension lease payments, [Sub] would share in the future sale or lease of the building until we recover at least said remaining $56,501.00.

*Id.* at 478 (emphasis added). After several emails concerning documentation, Lukes replied, "Once we receive our return on equity, Insight will share all future rents and/or sale of the building 50/50." *Id.* at 477.

This transaction was memorialized in three documents: a Master Lease Agreement, an amendment to that agreement providing that Sub would direct Prime to send its rent payments directly to Insight's bank, and a Remarketing Agreement (collectively the Sub-Insight Agreement). The Sub-Insight Agreement terms the parties' arrangement as a "lease," characterizing the transaction as a purchase by Insight of the completed Module, followed by a lease back to Sub. *Id.* at 671. In sum, Insight provided cash funding in exchange for monthly rent payments and an ownership interest in the Module. Insight stipulated that it "did not manufacture, deliver, or install" the building. *Id.* at 368 (joint stipulation). Surety was not made aware of this agreement.

5

In late December 2017, Sub sent Insight an invoice for $410,000. Although Insight advanced the money, Sub did not repay Insight, apparently because Prime did not pay Sub.

In July 2018 Insight submitted a claim against Surety under the Bond. Surety denied Insight's claim, stating that Insight was not a proper *claimant* because it had not provided labor or material to Sub—rather, it had "provide[d] funding." *Id.* at 95.

### C.    Court Proceedings

In August 2020 Insight sued Surety in the United States District Court for the Western District of Oklahoma, asserting claims for breach of contract, bad faith, and breach of the duty of good faith and fair dealing.

In May 2022 the district court granted Surety's motion for summary judgment. In doing so, the court treated Insight's separate claims for bad faith and breach of the duty of good faith and fair dealing together, ruling that they actually "represent the same cause of action under Oklahoma law." *Insight Invs., LLC v. N. Am. Specialty Ins. Co.*, No. CIV-20-788-G, 2022 WL 1630982, at *7 n.6 (W.D. Okla. May 23, 2022). The court then considered "the totality" of the Sub-Insight transaction, *id.* at *8, including prior email communications in which Insight repeatedly characterized its contribution in terms of funding or financing, *see id.* at *5–6, 8. The court held that Insight was not a proper *claimant* under the Bond because it provided "only money, not material." *Id.* at *8. And "[s]tructuring [Sub]'s repayment obligation as a lease [did] not convert Insight into a material supplier—Insight was simply an investor." *Id.*  Because Insight's claims were "premised on its status as a

6

claimant, and thus a third-party beneficiary, under the Bond, establishing that Insight [was] not a claimant under the Bond [was] a complete defense to those claims." *Id.* at *7 n.7 (citation omitted).

In March 2024, however, the district court denied Surety's motion for prevailing-party attorney fees under Okla. Stat. Ann. tit. 12, § 936. That statute provides: "In any civil action to recover for labor or services rendered, . . . the prevailing party shall be allowed a reasonable attorney fee[.]" *Id.* § 936(A). Because the court had awarded summary judgment to Surety "on the basis that Insight did *not* render labor or services," it held that Surety was not entitled to attorney fees under the statute. *Insight Invs.*, *LLC. V. N. Am. Specialty Ins. Co.*, No. CIV-20-788-G, 2024 WL 1336338, at *2 (W.D. Okla. Mar. 27, 2024) (emphasis added).

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the summary judgment in favor of Surety on the merits and reverse the denial of prevailing-party attorney fees.

## II.    DISCUSSION

### A.    Summary Judgment

"We review de novo the district court's grant of summary judgment, applying the same legal standards that govern the district court." *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1249 (10th Cir. 2020). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

7

We apply "the substantive law of the forum state when sitting in diversity." *Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1156 (10th Cir. 1994). Although Insight asserts on appeal that the Sub-Insight Agreement was "negotiated, issued and executed in California" and "specifies it is governed by California law," Aplt. Br. at 11, Insight did not raise this issue before the district court. On the contrary, it repeatedly cited Oklahoma law. In addition, Insight states on appeal that there is "no conflict between California and Oklahoma law on the fundamental rule of contract interpretation" at play here: the parol-evidence rule. *Id.* Therefore, we apply Oklahoma law on this issue.[2]

We first conclude that Insight is not a proper *claimant* under the Bond. We then conclude that extrinsic evidence was admissible to show that.

### 1.     *Does Insight Qualify as a Claimant?*

On public projects, "[s]tatutes frequently require" a labor-and-material payment bond to protect labor and material suppliers, "since mechanics' liens cannot be asserted against government property." Restatement of the Law of Security § 165 at 459 (A.L.I. 1941); *see Boren v. Thompson & Assocs.*, 999 P.2d 438, 445 (Okla. 2000) ("[W]here public works projects are concerned, subcontractors [that is, laborers and materialmen] are protected by bonds because public property cannot be

---

[2] Although the name "parol *evidence* rule" may suggest that it is a rule of evidence, it is actually "part of the substantive law of Oklahoma." *Fulton v. L & N Consultants, Inc.*, 715 F.2d 1413, 1418 n.3 (10th Cir. 1982); *see* Restatement (Second) of Contracts § 213 cmt. a. at 129 (A.L.I. 1981) ("[T]he parol evidence rule . . . is not a rule of evidence but a rule of substantive law.").

8

encumbered by liens. Payment bond statutes which require bonds for public work projects are specifically provided for the benefit of subcontractors."). On this federal project, Prime was required by statute to obtain a payment bond to protect its subcontractors and their labor and material providers.[3] And Prime, in turn, required Sub to obtain the Bond to cover *its* labor and material providers.

Recall that the Bond was conditioned upon Sub not "promptly mak[ing] payment to all claimants as hereinafter defined, for all *labor and material* used or reasonably required for use in the performance of the subcontract." Joint App. at 69 (emphasis added). And it defines a *claimant* as "one having a direct contract with the [Sub] for *labor, material, or both*, . . . labor and material being construed to include

---

[3] *See* Aplee. Br. at 15 (confirming that Prime's federal "construction project [was] not lienable"); 40 U.S.C. § 3131(b) (Miller Act) ("Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government the following bonds, which become binding when the contract is awarded: . . . A payment bond with a surety satisfactory to the officer for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person."); Okla. Stat. Ann. tit. 61, § 1 ("A. Prior to an award of a contract exceeding One Hundred Thousand Dollars ($100,000.00) for construction or repair of a public or private building, structure, or improvement on public real property, the person that receives the award shall furnish a bond with good and sufficient sureties payable to the state in a sum not less than the total sum of the contract. B. The bond shall ensure the proper and prompt completion of the work in accordance with the contract and shall ensure that the contractor shall pay all indebtedness the contractor incurs for the contractor's subcontractors and all suppliers of labor, material, rental of machinery or equipment, and repair of and parts for equipment the contract requires the contractor to furnish."); *see also* Randi A. Donaldson, 9 Okla. Prac., Construction Law § 5:17 (2014 ed.) ("The Oklahoma 'Little Miller Act' [Okla. Stat. Ann. tit. 61, §§ 1, 2] is patterned after the federal Miller Act requiring bonds of certain types on public projects and providing remedies for unpaid subcontractors and suppliers.").

that part of water, gas, power, light, heat, oil, gasoline, telephone service, or rental of equipment directly applicable to the subcontract." *Id.* (emphasis added).

Insight does not fall under this definition. It admits that it "did not manufacture, deliver, or install" the Module. *Id.* at 368 (joint stipulation). Indeed, Sub had already completed all those steps by the time Insight executed its contract with Sub. Rather, the evidence establishes that what Insight provided to Sub was "financing." *Id.* at 460; *see, e.g.*, *id.* at 466 (Insight salesman asking, "How much were you looking for us to fund?"); *id.* at 478 (Sub's Vice President "accept[ing] the revised up-front funding of the building at $410,000.00").[4] And financing does not constitute labor or material.

---

[4] In the final pages of its opening brief, Insight contends that the district court disregarded *its* extrinsic evidence, which served to create a genuine dispute of material fact regarding its relationship with Sub. Insight references the affidavit of Lukes, who negotiated the Sub-Insight Agreement on behalf of Insight, and notes that he testified that Sub "asked solely for a sale/leaseback" and did not mention a "loan" arrangement. Aplt. Br. at 19; *see* Joint App. at 668 (testifying that Sub's Vice President "Salomone approached me/Insight on behalf of [Sub], requesting a lease, not a loan," and that "a loan was never discussed"). One problem for Insight, however, is that Lukes's subsequent deposition testimony contradicted his affidavit. Testifying as Insight's corporate representative, he repeatedly characterized Insight's business in terms of "invest[ing]," "financing," and "funding," *id.* at 761, 764–69, 775, just as he did in his email communications with Sub.

In any event, considering the evidence in the light most favorable to Insight, there is no *genuine* dispute as to the nature of the Sub-Insight transaction—Insight provided cash funding in exchange for assignment of the monthly rent payments from Prime to Sub and an ownership interest in the modular building. Therefore, the purported factual dispute is immaterial. Further, even if the transaction is characterized as a lease rather than a loan, Insight provided no labor or materials; as we proceed to discuss, its purchasing the Module and then leasing it back to Sub would not qualify it as a *claimant* under the Bond,

10

Oklahoma caselaw has long confirmed this conclusion. In *Rockwell Bros. & Co. v. Keatley*, 152 P. 449 (Okla. 1915), after a contractor entered into an agreement with a school district to provide labor and material for the construction of a high-school building, it executed a labor-and-material payment bond with a surety. A third party then advanced money to the contractor to pay for the labor and material, it failed to pay the money back, and the third party sued the contractor and the surety under the bond. *See id.* The Supreme Court of Oklahoma held that the labor-and-material payment bond was not "broad enough to include money loaned to the contractor for the purpose of paying for such labor and material." *Id.* at 450. In other words, the bond protected "those who might supply the contractor with *labor and material*," not "a party *advancing money*." *Id.* (emphasis added); *accord First Nat'l Bank v. S. Sur. Co.*, 161 P. 539, 540 (Okla. 1916) (following the "great weight of authority"); *see also First Nat'l Bank v. O'Neil*, 223 N.W. 298, 300 (Minn. 1929) ("The authorities are practically uniform that a bond to secure the payment of claims for labor and material does not inure to the benefit of one who *loans or advances funds* for the payment of such claims. The reason[s] for it [are] that claims for borrowed money are not within the condition of the bond, and . . . [t]he principal may not bind his surety to a new and different obligation or liability from that covered by the bond." (emphasis added; citation and internal quotation marks omitted)).

Unlike the situation in *Barbero v. Equitable General Insurance Co.*, 607 P.2d 670, 671–73 (Okla. 1980), where materialmen could collect on such a bond when they had agreed to provide a subcontractor with "all labor and materials" for a construction project and were not paid the agreed price, Insight provided no material to the Sub. As in *Keatley*

11

and *Southern Surety*, Insight merely "advanc[ed] money." *Keatley*, 152 P. at 450; *S. Sur. Co.*, 161 P. at 540.

Although Insight perfunctorily suggests that leasing the Module back to Sub constituted the rental of equipment, thus making it a *material* supplier, the entire Module can hardly be considered *equipment*. In the context of the Bond—which covers the labor and material suppliers that assisted Sub in building the Module—that term plainly refers to the tools and machinery used to help build the Module. *See Flintco, LLC v. Total Installation Mgmt. Specialists, Inc.*, -- P.3d --, 2025 WL 1513757, at * 9, 11–12 (Okla. 2025) (terms in a private surety bond are given their "plain meaning"); *Webster's Third New International Dictionary* 1443 (2002) (defining *equipment* as "the implements (as machinery or tools) used in an operation or activity"); *Linde Air Prods. Co. v. Am. Sur. Co.*, 152 So. 292, 293 (Miss. 1934) ("The word 'equipment,' [in a labor-and-material payment bond,] . . . must be given its usual and ordinary meaning, which is, the outfit, i.e., tools, machinery, implements, appliances, etc., necessary to enable one to do the work in which he is engaged."). And even if the Module were considered *equipment*, it was decidedly not "used or reasonably required for use in the performance of the subcontract," as required by the Bond. Joint App. at 69. Under that agreement, Sub designed, built, and installed the Module; the Module was not "used or reasonably required" to design, build, or install *itself*. *Id.* It would be nonsensical to say that the contract's end-product was *equipment* used in the performance of the contract.

In support of its argument, Insight cites *U.S. ex rel. Morgan Buildings & Spas, Inc. v. BKJ Solutions, Inc.*, No. CIV-09-730-M, 2012 WL 2994717 (W.D. Okla. July 20, 2012), asserting that in that case the "[p]ayment bond covered [a] claimant that supplied [a] modular building for [a] military base." Aplt. Br. at 14. But the claimant did not simply transport a modular building to the base; the claimant "constructed the modular buildings at the actual worksite, . . . and after the construction of the buildings, [it] installed interior floors, roofs, drop ceilings," etc. *Morgan Bldgs.*, 2012 WL 2994717, at *3. Unlike Insight, which provided only funding, the claimant in that case was paid for the labor and materials used in building and furnishing modular units.

Were we to hold that purchasing the completed Module and leasing it back to Sub qualified Insight as a material supplier, Sub could unilaterally increase Surety's potential liability, effectively making it the guarantor of Insight's funding (which Surety knew nothing about), on top of its obligation to Sub's labor and material suppliers. *See Whale v. Rice*, 49 P.2d 737, 741 (Okla. 1935) ("Nothing can be clearer, both upon principle and authority, than the doctrine, that the liability of a surety is not to be extended, by implication beyond the terms of his contract." (internal quotation marks omitted)); *O'Neil*, 223 N.W. at 300 ("The principal may not bind his surety to a new and different obligation or liability from that covered by the bond." (internal quotation marks omitted)). To be sure, if Insight had never advanced the money to Sub, then Sub might have failed to pay its labor and material suppliers, leaving Surety with a bill anyway. But under Insight's rationale, Surety could have been stuck with that same bill *plus*

13

Insight's bill. For instance, if Insight had advanced money to Sub, but Sub went way over budget and failed to pay Insight *or* its labor and material providers, Surety would have had to cover both bills. The Bond did not contemplate such an increase in potential liability. *See Wasatch Bank of Pleasant Grove v. Sur. Ins. Co. of Cal.*, 703 P.2d 298, 300 (Utah 1985) ("To hold the surety liable for advancements made or money loaned to the contractors to enable them to carry out the contract without the assent of the surety, unless the facts are such that it would be inequitable to not hold the surety liable, is to read into the contract a liability not assumed by the surety and a liability clearly not contemplated by the parties at the date of the execution of the bond. . . . To hold Surety liable would only shift the loss from one who assumed it to one who did not." (internal quotation marks omitted)); *see id.* ("In extending credit to [a subcontractor], Wasatch [Bank] assumed the risk that [the subcontractor] would default on the loan and that the security would fail. Had Wasatch deemed this risk unacceptable, it could have refused to make the loan without further security, including an express agreement from [the] [s]urety that the bond would cover the loan. Thus, the loss suffered by Wasatch was no greater than the risk it assumed in extending credit to [the subcontractor]."); *see also O'Neil*, 223 N.W. at 300 ("If upon an agreement so made by the lender and contractor, the surety of the bond is to be held liable for the money so advanced, the contractor could, if he saw fit, obtain the money by such means to pay for each and every item for material and labor used in the road, and, at its completion, the money for all the labor and material would still be owing and the surety on the bond liable therefor, although he had no knowledge of any money being borrowed by the contractor to pay for such material

14

and labor. This can hardly be the meaning of the language of the bond[.]" (ellipsis and internal quotation marks omitted)).

Insight also contends that the district court impermissibly added a new condition to the Bond—that Insight had to manufacture, deliver, or install the Module. But the court did not add a new condition. It merely said that Insight did not qualify as a *claimant* under the express conditions of the Bond because "[i]t is undisputed that Insight did not provide any labor or material to assist [Sub] with the design, manufacture, delivery, or installation of the [Module] at the [p]roject site." *Insight Invs.*, 2022 WL 1630982, at *8.

Insight points to *U.S. ex rel. Pileco, Inc. v. Slurry Systems., Inc.*, 804 F.3d 889, 893 (7th Cir. 2015), for the proposition that a lessor of construction equipment, which acts as a "middleman" between an equipment manufacturer/supplier and a contractor, is covered by a labor-and-material payment bond. But the situation in that case was entirely different from what we have here. Unlike in *Pileco*, where the equipment lessor was a subcontractor—that is, it had agreed to lease equipment to the prime contractor, and that equipment was delivered by a third party, *see id.* at 890–91—Insight was not a subcontractor. Rather, it was a financer merely purporting to buy the Module from Sub and lease it back. Whereas the subcontractor in *Pileco* leased actual *equipment* to the project—a "huge steel machine" called a "trench cutter"—Insight provided money. *Id.* at 890. In any event, as we have explained, the Module itself was not equipment.

15

Having concluded that Insight is not a proper Bond *claimant*, we next discuss why the parol-evidence rule is inapplicable.

## 2.    *Parol Evidence/The Stranger Exception*

"Under the parol evidence rule, pre-contract negotiations and oral discussions are merged into and superseded by the terms of an executed writing. The rule provides that parol evidence cannot vary, modify or contradict the terms of an executed written agreement." *First Nat'l Bank in Durant v. Honey Creek Ent. Corp.*, 54 P.3d 100, 103 (Okla. 2002) (citations omitted); *see* Okla. Stat. Ann. tit. 15, § 137 ("The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument."); *see also* Restatement (Second) of Contracts § 213 at 129 (A.L.I. 1981) (Under the parol evidence rule, "[a] binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them."). This rule promotes "the certainty and stability of contracts" by elevating them over the parties' pre-contract negotiations and making them the final word of the parties' arrangements. *Honey Creek*, 54 P.3d at 103; *see* Carter G. Bishop, Daniel D. Barnhizer & George A. Mocsary, Contracts: Cases and Theory of Contractual Obligation at 390 (3d ed. 2010) ("[T]he parol evidence rule purposes to define and limit the universe of terms and meanings that are the subject of a court's determination of the parties' intentions where the parties have reduced at least some part of their agreement to writing."); *id.* at 392 ("We presume that if the

16

parties took the time to memorialize their agreement then the writing is the best evidence of what the parties intended the written words and terms to mean.").

But as the Supreme Court of Oklahoma said nearly a century ago, the parol-evidence rule "applies only in controversies between the parties to the instrument and those claiming under them." *In re Assessment of Alleged Omitted Prop. of Kennedy for Tax'n in Osage Cnty. for 1917*, 58 P.2d 134, 137 (Okla. 1936) (internal quotation marks omitted); *see Fulton v. L & N Consultants, Inc.*, 715 F.2d 1413, 1418 (10th Cir. 1982) (in Oklahoma "the parol evidence rule only applies to parties to the agreement and their privies");[5] *In re McClain*, 447 F.2d 241, 244 (10th Cir. 1971) (under Oklahoma law "[t]he parol evidence rule applies only to the parties to the agreement in question").

This limitation on the application of the parol-evidence rule is commonly referred to as the "stranger exception." *See* Peter Linzer, 6 *Corbin on Contracts* § 25.24 at 319 (revised ed. 2010) ("[M]any courts . . . adopt what is often called 'the stranger exception' or the 'stranger rule,' that a third party may not invoke the parol evidence rule in connection with a contract to which it was not a signatory. There are also times when it is the 'stranger' who proffers parol evidence and seeks to take

---

[5] Those "claiming under" the parties, *Osage County*, 58 P.2d at 137 (internal quotation marks omitted), are sometimes referred to as "privies," *Fulton*, 715 F.2d at 1418. But that term should not be construed too broadly. The parol-evidence rule does not apply to those whose "interest is not aligned with or related to protection of the integrity of actual terms agreed on" in the contract at issue. *Id.* at 1418 n.4. Here, Surety's interest was *not* "aligned with or related to protection of the integrity of" the terms of the Sub-Insight Agreement, which it was not made aware of, and which attempted to enlarge Surety's liability under the Bond. *Id.*

17

advantage of the exception."); *see also Osage County*, 58 P.2d at 137 (stating that the parol evidence rule "has no application in controversies between a party to the instrument on the one hand and a stranger to it on the other, for the *stranger* not having assented to the contract is not bound by it, and *is therefore at liberty* when his rights are concerned *to show that the written instrument does not express the full or true character of the transaction*." (emphasis added and internal quotation marks omitted)); Richard A. Lord, 11 *Williston on Contracts* § 33:9 at 934 (4th ed. 2012) ("The parol evidence rule is frequently held to apply only to the contracting parties and their privies and not to third persons, often referred to as strangers to the contract[.]" (citing *Fulton*, 715 F.2d 1413 (10th Cir. 1982) ("applying Oklahoma law"))).

Insight's primary argument is that the district court impermissibly relied on parol evidence to find that, contrary to the Sub-Insight Agreement's "unambiguous terms" describing the transaction as a lease, the transaction was, in fact, a financing arrangement. Aplt. Br. at 12. But this argument fails under Oklahoma's stranger exception. Because Surety was not a party to that agreement, Surety was not bound by it, and the parol-evidence rule did not bar Surety from challenging with contradictory extrinsic evidence the agreement's description of the relationship between Insight and Sub.

Nearly a century of caselaw supports this conclusion. In 1936 the Oklahoma Supreme Court considered a dispute between taxpayers and the State regarding whether the taxpayers still owned some real estate on January 1, 1917. *See Osage Cnty.*, 58 P.2d

18

at 135. The taxpayers asserted that a contract for sale of the property "control[led] the question" of who owned the property on that date, that the contract was "clear and unequivocal," and that the trial court "erred in receiving parol evidence to change the plain provisions of said contract." *Id.* But the court rejected the argument, holding that the parol-evidence rule "has no application in controversies between a party to the instrument on the one hand and a *stranger* to it on the other." *Id.* at 137 (emphasis added). Because "[t]he state was not a party to the contract in question," the state's extrinsic evidence was "admissible to show the real intention of the parties." *Id.*

A half-century ago this court recognized Oklahoma's stranger exception in a dispute regarding whether the creditor bank had filed a security interest in a truck in the correct county. *See McClain*, 447 F.2d at 243–44. Which county was the proper county depended on whether the truck was for personal use or primarily for business. *See id*. at 243. The security agreement signed by the truck owner when financing his purchase of the truck said that it was primarily for business use and the county in which to file the lien was chosen accordingly. But the trustee in bankruptcy of the owner's estate challenged the bank's lien priority by offering evidence that the truck was never used for business. *See id.* We said that under Oklahoma law, "[t]he parol evidence rule applies only to the parties to the agreement in question." *Id.* at 244 (citing, among other authorities, *Osage Cnty.*, 58 P.2d at 137). Because the trustee was a "*third party* attacking the security interest," the rule did not apply. *Id.* (emphasis added). So too here, Surety is a third party attacking the Sub-Insight

19

Agreement's characterization of that transaction, and the parol evidence rule is thus inapplicable.

As a result, we are not "limited to the contractual terminology between the parties or the way they choose to describe the working relationship," but instead look to "the economic realities," as we do when evaluating whether an individual is an employee or an independent contractor. *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1159–60 (10th Cir. 2018). And as we have discussed, the "economic realities" reflect that Insight was not a proper *claimant* under the Bond. *Id.* at 1159.

Because Insight's claims for breach of contract and bad faith were predicated on its status as a Bond *claimant*, Surety's establishing otherwise provided a complete defense to those claims. Insight, not being a Bond *claimant*, is not a third-party beneficiary under the Bond, and thus it has no contractual or statutory foundation upon which to assert its claims against Surety. We therefore affirm the district court's summary judgment on the merits. *See Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1229 (10th Cir. 2012) (affirming a judgment in favor of an insurer under Oklahoma law where there was no "contractual or statutory relationship between the insurer and the third party," so the third party could not pursue its contractual and bad-faith claims (internal quotation marks omitted)).

### B.     Prevailing-Party Attorney Fees

"In diversity cases, attorney fees are [ordinarily] a substantive matter controlled by state law." *Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 1001 (10th Cir. 2008); *see Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A,*

20

*L.P.*, 888 F.3d 455, 460 (10th Cir. 2017) (noting that in federal diversity litigation, state law governs fees that are dependent on the outcome of the litigation, but procedural fees, such as sanctions for misconduct during the litigation, are generally governed by federal law). Under Oklahoma law, "whether a party is entitled to an award of attorney fees . . . presents a question of law subject to the *de novo* standard of review." *Waits v. Viersen Oil & Gas Co.*, 456 P.3d 1149, 1151–52 (Okla. Civ. App. 2020).

> The relevant attorney-fee statute, Okla. Stat. Ann. tit. 12, § 936(A), provides:

> In any civil action to recover for labor or services rendered, . . . unless otherwise provided by law or the contract which is the subject of the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

On cross-appeal Surety argues that it is entitled to attorney fees under the statute because Insight *brought an action* to recover for labor or services rendered. Insight contends the opposite, because the district court determined that it had not, *in fact*, rendered any labor or services. We agree with Surety.

The Supreme Court of Oklahoma has said: "[I]t is the *underlying nature of the suit itself* which determines the applicability of the labor or services provisions of § 936." *ABC Coating Co. v. J. Harris & Sons Ltd.*, 747 P.2d 271, 273 (Okla. 1987) (emphasis added); *see Maxxum Constr., Inc. v. First Com. Bank*, 256 P.3d 1058, 1060 (Okla. Civ. App. 2011) ("[I]f the underlying nature of the suit is one to recover for unpaid labor or services rendered, § 936 authorizes an award of prevailing party attorney's fees[.]"); *see also Kay v. Venezuelan Sun Oil Co.*, 806 P.2d 648, 652

(Okla. 1991) (focusing on "the gravamen of the action" to determine whether § 936 applied). Accordingly, a prevailing party is entitled to attorney fees "where suit is *brought* for labor [or] services rendered." *ABC Coating*, 747 P.2d at 273 (Okla. 1987) (emphasis added and internal quotation marks omitted); *see Burrows Constr. Co. v. Indep. Sch. Dist. No. 2 of Stephens Cnty.*, 704 P.2d 1136, 1138 (Okla. 1985) ("If the action is brought for labor and services rendered, the provisions of section 936 apply.").

Here, the "underlying nature of [Insight's] suit" is one to recover for services rendered. *ABC Coating*, 747 P.2d at 273. Insight pleaded that it had provided material to the project, had not been paid, and was entitled to payment from Surety. *See* Joint App. at 33–34, 38–39 (First Amended Complaint alleging that Insight "provide[d] the [Module] at the Base," that it had not been paid, that it was a proper "claimant under the [Bond]," and that it was entitled to more than $450,000 in damages). If Insight had prevailed it would have been compensated—that is*, recovered*—for services rendered. Indeed, Insight contended that if it prevailed, *it* was entitled to attorney fees under § 936. *See* Aplee. Supp. App. at 64 (final pretrial report). Given that Surety prevailed, it is the party entitled to attorney fees under the statute. Whether "suit is *brought* for labor [or] services rendered," *ABC Coating*, 747 P.2d at 273 (emphasis added and internal quotation marks omitted), depends on what the suit claims, not who prevails.

The caselaw relied on by the dissent does not override this commonsense construction of the statute. The dissent relies primarily on language in a decision by

Oklahoma's intermediate appellate court, *Nayles v. Dodson*, 476 P.3d 1245, 1248 (Okla. Civ. App. 2020). It is necessary to put this language in context. In that case the plaintiffs had placed a $1,000 deposit against the purchase of a vehicle, but then decided it was overpriced and declined to buy it. The defendant refused to refund the deposit. The plaintiffs obtained a judgment and then sought attorney fees, relying on the same statute involved in this case, § 936 (now codified as § 936(A)), which provided attorney fees "[i]n any civil action to recover . . . on . . . [a] contract relating to the purchase or sale of goods, wares, or merchandise . . . ." The defendant argued that the statute did not cover the plaintiffs' claim because the claim did not allege any actual purchase or sale of goods. The court rejected that argument, noting that all that was required was a contract *relating* to such a sale. The court distinguished the statute's "relating to" language applicable to transactions in goods from the language regarding labor or services, which permits attorney fees "[i]n any civil action to recover for labor or services rendered."[6] Regarding the latter context, the court said "a claim under that provision must be for labor and services actually provided." *Id.* at 1249.

---

[6] Section 936 stated at that time:

> In any civil action to recover for labor or services rendered, or on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law or the contract which is the subject of the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

*Nayles*, 476 P.3d at 1249

Ignoring the language "a claim . . . for," the partial dissent focuses on the words "actually provided" and infers that attorney fees are allowable only if labor and services were actually provided. But the obvious thrust of *Nayles* was that the plaintiffs could collect attorney fees even though they did not *allege* that there had been any purchase or sale of goods; it was enough that their transaction "related to" the sale of goods. The court's discussion of attorney fees in the labor-or-materials context was not a holding; and, more importantly, the court was just considering what needs to be claimed, not what needs to be proved. The distinction between contracts for the sale of goods and contracts for labor or materials was that in the sale-of-goods context the claim need only *relate* to a sale (as was the case in *Nayles*), whereas in the labor-or-materials context, it is not enough that the claim *relate* to the provision of labor or materials—there must be a claim to recover for labor or materials that were provided. The case before us on appeal involves such a claim.

The dissent does not, and cannot, cite any reported case (other than the decision below), where attorney fees have been denied a defendant simply because the plaintiff could not prove its *claim* that it is owed money for labor or services it provided. Not only do the cases relied on by the dissent involve other types of claims—claims labeled by the courts as *collateral* to the provision of labor or services—but several of the opinions in those cases (as already noted in our discussion) restate the proposition that it is the claim, not the actual fact, that determines the applicability of the attorney-fee statute. We address the other cases relied on by the dissent in the order discussed in the dissent.

24

In *Russell v. Flanagan*, 544 P.2d 510, 512 (Okla. 1975), the claim was not to be paid for labor or services provided, but a claim of breach of warranty against the person providing the labor—"an action collaterally concerning labor or services, . . . not a civil action for labor or services within the meaning of the statute."

In *Burrows*, 704 P.2d at 1137, the plaintiff construction company "was paid according to the terms of the contract." But it claimed that it would have made more money (by reducing the sales taxes due) if, as allegedly agreed, it had been appointed the purchasing agent for the project. The court said, "It is the underlying nature of the suit itself which determines the applicability of the labor and services provisions of section 936." *Id.* (footnote omitted). This claim, held the court, "did not directly relate to the rendition of labor or services, and was thus not subject to the provisions of section 936." *Id.* at 1138. In contrast, "If the action is *brought* for labor and services rendered, the provisions of section 936 apply." *Id.* (emphasis added).

In *ABC Coating*, 747 P.2d at 272, the plaintiff had developed a special process used in reinforcing concrete and entered into arrangements for the defendant to use the process, but the defendant terminated the arrangement. The plaintiff then sued "for appropriation of trade secrets, fraud, breach of a secrecy agreement and unjust enrichment." *Id.* The defendant prevailed and was awarded attorney fees under § 936 based on the "for labor or services" language. The state supreme court reversed. Under the dissent's interpretation of the statute, reversal was obvious because plaintiff's claim proved unmeritorious. But the court took a different path. It wrote, as we said previously, "[I]n each case it is the underlying nature of the suit itself

25

which determines the applicability of the labor or services provisions of § 936. The question is whether the damages arose directly from the providing of labor or services [in which case fees may be awarded], or from an aspect collaterally relating to labor services [in which case fees are not available]." *Id.* at 273. The distinction being made by the court was not between law and equity (as suggested by the partial dissent) but between claims for failure to pay for labor or services and claims merely related to labor or services. In that case, "none of [the plaintiff's claims] arose directly from the rendition of labor or services." *Id.*

Finally, in *Kay*, 806 P.2d at 649, plaintiff performed services for an oil company and was paid as agreed: a thousand dollars per month plus expenses and the assignment of an overriding royalty interest in certain of the company's leases. The plaintiff was paid the royalty interests in oil produced from the lease but received nothing with respect to gas production. *See id.* at 649–50. The plaintiff sued for gas royalties, but the assignments were interpreted by the court as not including gas. *See id.* at 650. The company unsuccessfully sought attorney fees under § 936. The action was for interpretation of the royalty assignment, and was "only collaterally related to the agreement for labor and services." *Id.* at 652. Relevant to our case, the court's opening paragraph stated that "the labor and services provisions of § 936 authorize attorney fees to *prevailing* parties in actions for the recovery of money due for labor and services performed." *Id.* at 649 (emphasis added and internal quotation marks omitted). Surely a party who successfully defends a claim for labor and services by

26

showing that no such labor or services were performed is a *prevailing* party and entitled to attorney fees.

Indeed, we note that Insight's interpretation is not only contrary to the clear import of the language of the Oklahoma statute, but a contrary interpretation would lead to an absurd result. As Insight would have it, whenever the defendant prevailed—that is, whenever the court ruled that the plaintiff was not entitled to compensation for labor or services rendered—the defendant would perforce be barred from collecting an attorney fee. In other words, the statute would benefit only plaintiffs. Surely, if that were the legislature's intent, it would have explicitly said so. Unsurprisingly, *Kay* rejected that interpretation.

We therefore reverse the district court's denial of prevailing-party attorney fees.

### III.    CONCLUSION

We **AFFIRM** the district court's summary judgment and **REVERSE** its denial of prevailing-party attorney fees. We **REMAND** for further proceedings to determine the amount of the fee award.

Entered for the Court

Harris L Hartz
Circuit Judge

27

24-6068 & 24-6076, *Insight Investments, LLC v. North American Specialty Ins. Co., et al.*
**EID**, J., concurring in part and dissenting in part.

I agree with the majority that Insight is not a proper claimant under the bond issued by the North American Specialty Insurance Company ("NASIC") and that the parol evidence rule did not bar NASIC from offering extrinsic evidence to show that the agreement between Insight and Icon was for financing, rather than for labor or materials. But I do not agree with the majority's conclusion that NASIC is entitled to an award of attorney fees under the relevant attorney-fee statute, Okla. Stat. Ann. tit. 12, § 936(A). In my view, Oklahoma courts have already answered the question before us: the provision of § 936 at issue here—which authorizes attorney fees "[i]n any civil action to recover for labor or services rendered"—only applies when the underlying claim involves a direct contract "for labor and services *actually provided*." *Nayles v. Dodson*, 476 P.3d 1245, 1249 (Okla. Civ. App. 2020) (emphasis added). Applying that principle here, NASIC is not entitled to attorney fees because Insight did not actually provide any labor or services to Icon, and because Insight's contract with Icon—the putative "labor and services" contract—is only collateral to Insight's claim against NASIC. Because the majority concludes otherwise, I respectfully dissent as to Part II.B of its decision.

Oklahoma has long "follow[ed] the American Rule, which states that each litigant pays for their own legal representation" unless a specific statute or contractual provision permits an award of attorney fees. *Lunn v. Continental Motors, Inc.*, 568 P.3d 589, 591 (Okla. 2025); *see Kay v. Venezuelan Sun Oil Co.*, 806 P.2d

648, 650 (Okla. 1991). And even where a particular statute authorizes or mandates an award of attorney fees—as is the case with § 936—Oklahoma courts require that the statute be "strictly applied." *Kay*, 806 P.2d at 650.

Oklahoma courts have therefore taken a narrow view of § 936. Specifically, Oklahoma courts have held that the provision of § 936 at issue here, which mandates an award of attorney fees to the prevailing party "[i]n any civil action to recover for labor or services rendered," only applies when the underlying claim arises out of (1) a *direct* contract (2) for labor or services *actually* rendered. *Nayles*, 476 P.3d at 1249; *see id.* at 1250 ("[A] 'labor and services' claim must *centrally* involve labor and services *actually* rendered." (emphases added)). Thus, when a claim only "collaterally concern[s]" a contract for labor or services, § 936 does not apply. *Russell v. Flanagan*, 544 P.2d 510, 512 (Okla. 1975); *Kay*, 806 P.2d at 652 (declining to apply § 936 where the claim was only "collaterally related to the agreement for labor and services"); *Nayles*, 476 P.3d at 1248 (stating that § 936 does not apply if the labor-and-services contract is only a "peripheral matter" in the action).

Given those limitations, the Oklahoma Supreme Court has declined to apply § 936 to claims for breach of warranty based on a labor contract, *see Russell*, 544 P.2d at 512; to claims for lost profits based on breach of a construction contract, *see Burrows Constr. Co. v. Indep. Sch. Dist. No. 2 of Stephens Cnty.*, 704 P.2d 1136, 1138 (Okla. 1985); to claims for misappropriation of trade secrets and fraud, *see ABC Coating Co., Inc. v. J. Harris & Sons Ltd.*, 747 P.2d 271, 273 (Okla. 1987); and to claims involving a contractual assignment of the right to receive royalties from

2

mineral leases used to produce oil and gas, *see Kay*, 806 P.2d at 651–52. The majority dismisses these cases largely because they concern collateral claims. *See* Maj. Op. at 24–25. But these cases serve the important purpose of showing that the Oklahoma Supreme Court has continually denied claims for attorney fees under § 936 that only collaterally concern labor or services. We should not depart from this rule.

Like the underlying claims in those cases, Insight's claim against NASIC is not within the scope of § 936. For one thing, the putative labor-and-services contract at issue here—the agreement between Insight and Icon—is only "collaterally related" to Insight's claim under the NASIC bond. *Kay*, 806 P.2d at 652. Insight's claim was not one to recover directly for the non-payment of labor or services from the party that received the labor or services, as § 936 requires; instead, Insight's claim sought indemnity from a third party. And because Insight's collateral agreement with Icon was one for financing—rather than for labor or services—Insight's claim against NASIC under the bond did not "*centrally* involve labor and services *actually* rendered." *Nayles*, 476 P.3d at 1250 (emphases added). That being so, Insight's claim against NASIC falls outside of § 936's scope.

In concluding to the contrary, the majority relies on language from the Oklahoma Supreme Court stating that "it is the underlying nature of the suit itself which determines the applicability of the labor or services provisions of § 936." Maj. Op. at 21 (quoting *ABC Coating Co.*, 747 P.2d at 273). But that statement in *ABC Coating* was referring to the principle that a party may recover attorney fees

3

under § 936 even when the claim is equitable in nature—such as a claim for unjust enrichment or quasi-contract—so long as "the damages arose directly from the providing of labor or services, such as the failure to pay for those services," rather than "from an aspect collaterally relating to labor or services." 747 P.2d at 272–73. This is the correct interpretation because the Oklahoma Supreme Court clearly expressed that while, in *ABC Coating Co.*, "the trial court was correct in its finding that attorney's fees may be awarded under § 936 to the prevailing party in an action on quasi-contract," it noted that "such an award may be made only if the type of contract in question is one of those *enumerated in the statute*." *Id.* (emphasis added). The thrust of the court's holding, therefore, was to include equitable claims within the scope of § 936.

In any event, the underlying nature of the suit here further underscores that § 936 does not apply. "[T]he gravamen of the action" between Insight and NASIC "is the interpretation and effect of the language" of the collateral agreement between Insight and Icon—*not* whether Icon breached that agreement, whether Insight has a right to collect payment from Icon, or the amount that Icon owed for that breach. *Kay*, 806 P.2d at 652. Put differently, the parties here do not dispute the existence of Icon's breach of its agreement with Insight, nor do they dispute whether or how much Insight could have recovered in a direct action against Icon. Instead, the parties dispute whether and to what extent Insight and Icon's agreement obligated NASIC as a surety. Such a claim is not fee-bearing under § 936.

4

Finally, the majority insists that interpreting § 936 in this way "would lead to an absurd result" by effectively barring prevailing defendants from ever collecting attorney fees and thereby benefitting only plaintiffs. Maj. Op. at 27. But such a result is "not so absurd as to undermine the most natural reading" of § 936's text or to warrant a departure from the way Oklahoma courts have applied that text. *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 193 (2020) (Thomas, J., dissenting). Indeed, Oklahoma courts have suggested that the state legislature may have specifically designed § 936 to limit attorney fees awards in this way. *See Nayles*, 476 P.3d at 1250 ("The Legislature chose to adopt the *Russell* rule that a 'labor and services' claim must centrally involve labor and services actually rendered, but clearly did not adopt the 'goods actually delivered' standard stated in n. 11 of *Kay*."). And we have especially good reason to apply § 936 narrowly, given Oklahoma's general adherence to the "American Rule" of attorney fees and given Oklahoma courts' admonition that the statute be "strictly applied." *Kay*, 806 P.2d at 650.

Applying that statutory text, I would hold that § 936 does not apply to Insight's claim against NASIC and would therefore affirm the district court's denial of NASIC's motion for attorney fees. Because the majority concludes otherwise, I dissent from Part II.B of the majority's decision.

5